UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CARDIZEM CD ANTITRUST
LITIGATION.

Master File No. 99-md-1278
MDL No. 1278

Honorable Nancy G. Edmunds

THIS DOCUMENT RELATES TO:

Blue Cross Blue Shield of Michigan,
et al. v. Aventis, S.A., et al.,

Case No. 01-72806

## ORDER NO. 70
## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE BLUE CROSS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants Aventis and Andrx each bring separate motions to dismiss (or strike) the First Amended Complaint filed by BCBS of Michigan, BCBS of Minnesota, BCBS of Massachusetts, and Excellus Health Plan, Inc. ("Blue Cross Plaintiffs"). Plaintiffs have responded. For the reasons stated below, this Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

I.   **Standard of Review**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12 (b) (6) tests the sufficiency of a complaint. The complaint is viewed in a light most favorable to the plaintiff. The Court assumes that the plaintiff's factual allegations are true and determines whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994);

Bower v. Fed. Express Corp., 96 F.3d 200, 203 (6th Cir. 1996); Forest v. United States Postal Serv., 97 F.3d 137, 139 (6th Cir. 1996).

This standard of review "'requires more than the bare assertion of legal conclusions.'" In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997) (quoting Columbia Natural Res., Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)). The complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under some viable legal theory." See In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir. 1993) (citations omitted). A court should not grant a Rule 12(b)(6) motion unless the movant shows "beyond doubt that the plaintiff can prove no set of facts in support of his claim." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

II.  Analysis

In addition to the now familiar facts regarding Defendants' actions to restrain and monopolize the market of Cardizem CD and its AB-rated generics, the Blue Cross Plaintiffs allege the following facts showing how Defendants' conduct targeted and harmed third-party payers, like the Blue Cross Plaintiffs, specifically. Generally, in the prescription drug market, the consumer of the product (the patient) is not primarily responsible for the cost of the drug, because the patient is covered by a drug benefit provided through a Blue Cross or similar plan. With prescription drugs, the physician prescribes, the pharmacist dispenses, and the patient consumes the medication, but in most cases, it is the third party payer who actually pays. For example, in 1998, third party payers, like the Blue Cross Plaintiffs, were responsible for 73% of the retail costs of prescription drugs. Thus, entities

like the Blue Cross Plaintiffs are chiefly harmed by Defendants' anti-competitive conduct. (Compl. ¶¶ 8, 40.)[1]

Blue Cross Plaintiffs further allege that: (1) Defendants' unlawful efforts to keep AB-rated generics for Cardizem CD off the market were intended to thwart Plaintiffs' (and other third party payers') efforts to shift pharmacy prescriptions for Cardizem CD to lower priced generic equivalents through state mandatory drug substitution statutes and other cost containment programs, such as differential co-payments, maximum allowable cost programs ("MAC"), formularies, and pharmacy generic substitution incentives; (2) Defendants were aware of the threat to brand-name market share (and revenues) posed by the Blue Cross Plaintiffs' ability to control costs once AB-rated substitutes were made available; and (3) Defendants sought to protect their market share and revenues by preventing interchangeable generic products from competing with Cardizem CD. (Compl. ¶¶ 40-55.) As a direct result of Defendants' illegal conduct, Blue Cross Plaintiffs allege they were forced to pay millions in overcharges. (Compl. ¶ 1.)

Defendants have filed motions seeking to dismiss the Blue Cross Plaintiffs' claims. Plaintiffs respond that Defendants have not met their Rule 12(b)(6) burden of showing that Plaintiffs can prove no set of facts which would entitle them to relief. This Court addresses each of Defendants' dismissal arguments below, beginning with claims asserted under the Massachusetts Consumer Protection Act.

---

[1] All paragraph references are to the Blue Cross Plaintiffs' First Amended Complaint filed on September 24, 2001.

### A. BCBS Massachusetts's Claims Under the Massachusetts Consumer Protection Act

BCBS Massachusetts seeks damages under the Massachusetts Consumer Protection Act ("MCAP"), Mass. Gen. Laws, ch. 93a, § 2.² Section 9 of that Act creates a private right of action for persons injured by MCAP violations. Defendants raise three arguments why these claims should be dismissed: (1) Plaintiff is an indirect purchaser who cannot sue for damages under the Massachusetts Antitrust Act and thus cannot attempt an "end-run" around that Act by seeking damages under Massachusetts's Consumer Protection Act; (2) Plaintiff is an indirect purchaser who engages in trade or commerce and thus cannot maintain a claim under Sections 9 or 11 of the Consumer Protection Act; and (3) BCBS Massachusetts does not and cannot allege conduct that occurred predominantly within Massachusetts as required under the Consumer Protection Act, Mass. Gen. Laws ch. 93a, §11, para. 8.³ As discussed more fully below, Defendants' arguments do not support dismissal under Rule 12(b)(6).

#### 1. "End-Run" Argument

In light of a February 8, 2002 decision by Massachusetts's highest court, this Court rejects Defendants' "end-run" argument. In *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303 (Mass. 2002), the court rejected the identical argument Defendants assert here and held that indirect purchasers "can assert claims for price-fixing or other anticompetitive

---

²Section 2 provides that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

³Mass. Gen. Laws ch. 93a, §11, para. 8 provides that "[n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."

4

conduct under G.L. c. 93A § 9, where they have no standing to bring such claims under Massachusetts Antitrust Act (Antitrust Act), G.L. c. 93, §§ 1-14A." *Id.* at 306. The *Ciardi* court observed that "General Laws c. 93A [Massachusetts's Consumer Protection Act] regulates trade and commerce 'directly or *indirectly* affecting the people of this commonwealth.'" *Id.* at 308 (quoting G.L. c. 93A, § 1 and adding emphasis). It further observed that "[t]he broad language of G.L. c. 93A, § 9(1), provides that a cause of action may be brought by '[a]ny person, [other than a businessperson entitled to bring an action under § 11], who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two.'" *Id.* Rejecting the defendants' argument that a negative inference of legislative intent should be drawn by its failure to enact proposed *Illinois Brick* repealer statutes, the court observed that, "[w]here, as here, the language of a statute is clear and unambiguous, it is conclusive as to the intent of the Legislature." *Id.* at 310. *See also id.* at 310 n.15.

The *Ciardi* court further observed that the Massachusetts Antitrust Act provides that it "shall have no effect" upon the provisions of the Massachusetts Consumer Protection Act except as expressly provided in the Massachusetts Consumer Protection Act. *See id.* at 311 (quoting the Massachusetts Antitrust Act, Mass. G.L. c. 93, § 14A). The court then noted that Section 11 of the Massachusetts Consumer Protection Act "includes a specific provision that in any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act" whereas Section 9 "contains no such explicit provision." *Id.* at 311. Accordingly, the court reasoned, it could not conclude that Section 9 of the Massachusetts Consumer Protection

5

Act "is to be guided by the provisions of the Antitrust Act, and by association, *Illinois Brick* . . . , so as to preclude indirect purchasers . . . from bringing a cause of action" under Section 9 of the MCPA. *Id.* at S12.

### 2. Whether BCBS Massachusetts is a "Person Engaged in Trade or Commerce" and Thus Unable to Assert Claims Under Section 9 of the Massachusetts Consumer Protection Act

Defendants next contend that Plaintiff BCBS Massachusetts cannot assert a claim under Section 9 of the Massachusetts Consumer Protection Act because Plaintiff is "a person engaged in trade or commerce" and is therefore subject to Section 11's express command that suits brought by such persons are to be guided by the provisions of the Massachusetts Antitrust Act, and by association, *Illinois Brick*. BCBS of Massachusetts persuasively argues that a non-profit, tax-exempt corporation like it, that is merely engaged in the customary business necessary to meet its charitable purposes at the time of the relevant transactions, should not be considered as engaging in "trade or commerce" for purposes of Section 11 and thus it has standing to assert a claim under Section 9 of Massachusetts's Consumer Protection Act. The case law supports Plaintiff's argument. See *Trs. of Boston Univ. v. ASM Communications, Inc.*, 33 F. Supp. 2d 66, 77 (D. Mass. 1998) (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 952 F. Supp. 884, 890 n.4 (D. Mass. 1997) and observing that "[a] nonprofit or charitable corporation . . . is not engaged in trade or commerce 'if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose.'"). "Only if the nonprofit 'goes beyond its ordinary business' and aims instead to generate a profit does it fall within § 11." *ASM Communications*, 33 F. Supp. 2d at 77. See also *All*

6

*Seasons Servs., Inc. v. Comm'r of Health & Hosps.*, 620 N.E.2d 778, 780 (Mass. 1993) (observing that "the terms 'person who engages in any trade or commerce' were intended by the Legislature to refer specifically to individuals acting in a business context" and factors considered when making that determination "include the nature of the transaction, the character of the parties and their activities, and whether the transaction was motivated by business or personal reasons" and concluding that the defendant nonprofit hospital's solicitation of bids for a contract to provide food services was incidental to its core mission of providing medical services and thus the hospital was not engaged in a business context as defined by the MCPA) (internal quotes and citations omitted). The decision Defendants rely upon does not support a different result. *See Linkage Corp. v. Trs. of Boston Univ.*, 679 N.E.2d 191, 209 (Mass. 1997) (observing that "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission.").

The Massachusetts courts have long recognized BCBS Massachusetts' mission under Mass. Gen. Laws ch. 176A and B:

> Defendants Blue Shield of Massachusetts, Inc. and Blue Cross of Massachusetts, Inc. are nonprofit, tax exempt medical service and hospital service corporations, organized to provide for the preservation of the public health by furnishing medical services at low cost to members of the public who become subscribers . . .

*Kartell v. Blue Shield of Mass., Inc.*, 592 F.2d 1191, 1191 (1st Cir. 1979) (internal quotes and citations omitted). BCBS Massachusetts has pled facts showing that it is a nonprofit corporation created by statute and regulated by the Commonwealth of Massachusetts, and that the activity in question – its customary payment or reimbursement for its members' prescription drug benefits – falls within its charitable mission as set forth by statute and

7

case law. (Compl. ¶¶ 6-8, 14, 40-55.) Accordingly, this Court rejects Defendants' argument that BCBS Massachusetts' claims under the Massachusetts Consumer Protection Act must be dismissed.

### 3. Section 11's Requirement that Conduct Occur "Primarily and Substantially" in Massachusetts

Defendants' third argument – that Plaintiff cannot show that conduct occurred primarily and substantially in Massachusetts – is also rejected. Assuming *arguendo* that § 11 applies here, the Massachusetts courts have observed that the burden of disproving the "primarily and substantially" condition of § 11 is an affirmative defense to be developed by the defendant. *See Amcel Corp. v. Int'l Executive Sales, Inc.*, 170 F.3d 32 (1st Cir. 1999); *Gershman Co. v. Gen. Elec. Co.*, 176 F.3d 1, 6 (1st Cir. 1999) (same). Section 11 of Massachusetts's Consumer Protection Act specifically places the burden of proving this affirmative defense on the "person claiming that the transactions and actions did not occur primarily or substantially" within Massachusetts. *See* Mass. Gen. Laws ch. 93A, § 11 (2001). Accordingly, it would be premature to consider Defendants' argument at this stage of the proceedings.

### B. Excellus's Claims for Relief Under New York's Donnelly Act

Plaintiff Excellus seeks damages for Defendants' violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.* Defendants raise two dismissal arguments: (1) the Donnelly Act's December 1998 *Illinois Brick* repealer amendment cannot be applied retroactively to Plaintiff's antitrust claims which Defendants claim accrued in September 1997; and (2) the Donnelly Act does not include any provision comparable to or analogous with Section 2 of the Sherman Act with its prohibitions against monopolization and

8

attempted monopolization and thus Plaintiff's claims should be dismissed because they are based on unilateral conduct. This Court first addresses Defendants' arguments that the 1998 amendment to the Donnelly Act cannot be applied retroactively.

### 1. Donnelly Act 1998 Amendment - Retroactivity Argument

Defendants argue that, although New York passed an *Illinois Brick* repealer statute in 1998 amending § 340 of the Donnelly Act, Plaintiff Excellus's claims for antitrust damages flowing from pre- and post-amendment purchases must be dismissed because these claims all *accrued before the amendment's effective date*.[4] Defendants further argue that the amendment constitutes a substantive change in the law (by taking away the prior no-standing defense, by creating a new right to sue on the part of indirect purchasers, and by affecting the pre-existing rights of direct purchasers by forcing them to share damages with indirect purchasers) and thus is not a remedial statute that can be retroactively applied without express statutory authority.

Plaintiff responds that there is no retroactivity issue because (1) the continuing antitrust violation it alleges *accrued after the amendment's effective date*,[5] and (2) the plain

---

[4] Defendants argue that Plaintiffs' cause of action accrued no later than September 1997 when Defendants executed the HMRI/Andrx Agreement because this was the last overt act causing Plaintiffs' alleged antitrust injuries; not the last effect that Plaintiffs might feel as a result of the alleged anticompetitive conduct.

[5] Plaintiff argues that it has alleged a continuing antitrust violation that accrued after the amendment's December 23, 1998 effective date; i.e., that Defendants continued to act in concert to prevent any generic competition to Cardizem CD until June 23, 1999 when Defendant Andrx belatedly introduced its generic called Cartia XT. (Compl. ¶¶ 62, 92-94, 98, 100, 104.) Plaintiff emphasizes that it has alleged that Aventis made payments to Andrx as a continuation of their illegal scheme to forestall generic competition and preserve the Cardizem CD monopoly as late as June 1999 when Aventis paid Andrx $50,700,000 and the parties finally terminated the September 1997 HMRI/Andrx Agreement under

9

language of the 1998 Amendment clarifies that the critical element for indirect purchaser standing is the date on which the action was brought, and thus indirect purchasers are allowed to recover antitrust damages for pre-amendment purchases as long as the action seeking those damages is *filed after its effective date*. Plaintiff further argues that, even if the Court disagrees with the above arguments, the 1998 amendment may be retroactively applied to its pre-amendment purchases because it is remedial in nature.

As both parties acknowledge, this Court must predict how New York's highest court would decide this retroactivity issue. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450 (6th Cir. 2001). The answer falls somewhere between the parties' all-or-nothing positions. The Court first discusses the flaws in the parties' arguments, then examines whether the 1998 amendment is retroactive in operation, and finally considers whether the amendatory Act fits New York's definition of a remedial statute thus allowing retroactive application.

---

pressure from both the Federal Trade Commission and the national press. (Compl. ¶ 98.)

An argument strikingly similar to Plaintiff's continuing violation argument here was recently rejected by the United States District Court for the Southern District of New York. In *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002), the court granted the defendant's motion to dismiss, concluding that the plaintiffs' federal antitrust claims were time-barred. The court rejected the plaintiffs' argument that an exception to the four-year statute of limitations for continuing violations applied under the facts alleged in that case. It observed that "to establish a continuing violation, a plaintiff must prove a continuing series of overt acts, and, in these circumstances, the statute of limitations runs from the last such overt act." *Id.* at 378-79 (citing *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999)). It further observed that "to count as such an overt act, the act must be a new and independent act, not merely a reaffirmation of a previous act; and it must inflict new injury on the plaintiff." *Id.* at 379. The court reasoned that, although the plaintiffs had alleged payments were made after the execution of an alleged agreement to keep a competitor from entering the market, "such payments are mere consequences of the original Agreement and do not restart the statute of limitations." *Id.*

### a. The Parties' Arguments

In an attempt to bar recovery for both pre- and post-amendment purchases, Defendants erroneously assume that Plaintiff's cause of action accrued in September 1997 before the 1998 amendment's effective date. Defendants ignore the fact that the antitrust injury at issue here would occur and an antitrust cause of action would accrue when a plaintiff purchases supra-competitively priced drugs; antitrust injury would not necessarily occur on the same date that the HMRI/Andrx Agreement was entered into (September 1997).

Although a defendant may commit an antitrust violation at time T1 and the plaintiff suffers an injury at time T2, the plaintiff's cause of action accrues at time T2. See 2 Phillip E. Areeda, Roger D. Blair and Herbert Hovenkamp, *Antitrust Law*, ¶ 320d at 231 (2d ed. 2000). As these commentators observe, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* ¶ 320b at 207 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 n.3 (1971)). "Customers of the monopolist are not injured until after the monopolist causes them injury through higher prices, which may occur later than the exclusionary practices creating the monopoly. . . . Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them." *Id.* ¶ 320c4 at 221. Defendants' accrual arguments largely ignore these well-established principles.

Plaintiff's accrual argument is also flawed. In an attempt to recover antitrust damages for both pre- and post-amendment purchases, Plaintiff erroneously assumes that the 1998

11

amendment allows indirect purchasers to sue for pre-amendment damages as long as the cause of action seeking them accrues after the amendment's December 23, 1998, effective date. Plaintiff's argument – that it can seek damages for pre-amendment purchases because it alleges a continuing scheme in violation of the Donnelly Act that accrued after the amendment's effective date – ignores the fact that the 1998 amendment is not concerned with when a cause of action accrues under the Act.

Both parties fail to critically analyze the issue New York's 1998 *Illinois Brick* repealer amendment addresses: whether the purchaser's status (direct or indirect) at the time of purchase (time that antitrust injury is suffered) should determine the right to recovery. The parties do not dispute the general principle that the law applied is that in effect at the time of the relevant conduct. They do dispute, however, what relevant conduct the *Illinois Brick* repealer amendment addresses. Rather than focusing on the time of purchase (time antitrust injury is suffered) and the purchaser's status at that time (direct or indirect), they improperly focus on whether Plaintiff's cause of action accrued before or after the 1998 amendment's effective date. New York's 1998 *Illinois Brick* repealer amendment, however, does not address accrual. Accordingly, the point in time when this occurred is not particularly relevant to the question whether the 1998 amendment allows indirect purchasers to recover damages for both pre- and post-amendment purchases.

Plaintiff's additional argument – that the 1998 amendment should be interpreted to allow indirect purchasers to recover for pre-amendment purchases as long as the action seeking those damages is filed after the amendment's December 23, 1998 effective date – is also flawed. Plaintiff argues that the plain language of the 1998 amendment reveals not only its purpose; i.e., to assure an immediate remedy for indirect purchasers, but also

12

the intent that it be applied to all who commence an action after its effective date. This Court finds the latter part of this argument unconvincing. The plain language of the 1998 amendment supports the conclusion that the Legislature's purpose was to immediately remove any bar preventing indirect purchasers from recovering for injuries suffered as a result of Donnelly Act violations. It is not evident, however, that the Legislature intended that the amendment should alter pre-existing legal rights, which would occur if this Court did as Plaintiff urges and applied the amendment to all actions filed after its effective date regardless of when purchases were made (and concomitantly when antitrust injury was suffered).

Plaintiff argues that, when §§ 340(5) and (6) are read together, along with the Legislature's directive that § 340(6) take effect immediately, it is evident that the Legislature intended that any bar to indirect purchaser recovery be removed in any action commenced after its effective date. Moreover, Plaintiff contends, there is no retroactivity issue presented here because language in the amendment clarifies that it is directed toward all who have suffered damages; not just those who will suffer damages after the statute's enactment. If the Legislature had intended that the law apply only to those with future damages, Plaintiff argues, it would have used language that "any person who *sustains or hereinafter sustains* damages by reason of violation of this section" rather than the language used; i.e., "any person who has *sustained* damages by reason of violation of this section." *See* N.Y. Gen. Law § 340(6). It did not do so. Rather, Plaintiff argues, the Legislature intended that indirect purchasers have standing to sue for both pre- and post-amendment damages so long as that action was commenced after the amendment's December 23, 1998 effective date.

13

Examination of the 1998 amendment and New York law fails to support Plaintiff's statutory interpretation. The plain language of the 1998 amendment reveals that the New York Legislature was concerned with *who* (indirect and/or direct purchasers) should have standing to sue for damages under that State's antitrust statute; not *when* those lawsuits were filed. Moreover, despite Plaintiff's claims otherwise, its argument – that indirect purchasers can recover pre-amendment purchases as long as their lawsuit is filed after the amendment's effective date – necessarily requires retroactive application because it alters pre-existing legal rights when applied to pre-amendment purchases. *See In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1511376 at *3 (D. D.C. Oct. 6, 2000) (considering the same arguments Plaintiff presents here and similarly concluding that the statutory interpretation of § 340(6) advanced in that case and here "necessarily requires the Court to apply the Amendment retroactively."). The amendatory Act does not expressly provide for retroactive application. Accordingly, New York law requires that it be applied prospectively only. *See* N.Y. Stat. Law § 52 (McKinney 1971).

The strong presumption in the law against retroactive legislation flows from the principle "that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place. . . ." *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 946 (1997). New York law defines a retroactive statute "as one which takes away or impairs vested rights; it is a law which looks backward affecting acts occurring or rights accruing before it came into force." N.Y. Stat. § 51(a) (McKinney 1971). Thus, this Court "must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when it acted, would increase a party's liability for

14

past conduct, or would impose new duties with respect to transactions already completed." *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). *See also Miller v. Florida*, 482 U.S. 423, 430 (1987) (observing that "[a] law is retrospective if it changes the legal consequences of acts completed before its effective date") (internal quotes and citation omitted). The end result of the Court's inquiry is its determination that a statute does or does not alter pre-existing legal rights. The inquiry begins, however, by examining "the nature and extent of change in the law and the degree of connection between the operation of the new rule and a relevant past one." *Landgraf*, 511 U.S. at 270. As taught by the Supreme Court, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, . . . or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before the enactment." *Id.* at 269-70.

### b. Whether the 1996 Amendment is Retroactive in Operation

The Court begins its analysis of the retroactivity question by examining the plain language of the 1996 amendment to ascertain the New York Legislature's purpose and intent. "It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" and, because statutory text is "the clearest indicator of legislative intent", "the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 696 N.E.2d 978, 980 (N.Y. 1998) (internal quotes and citations omitted).

15

New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, was enacted in 1909 and is modeled after the Sherman Anti-trust Act of 1890. Accordingly, the Court of Appeals of New York has observed that it "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994) (internal quotes and citations omitted).

Plaintiff's arguments require that the Court read Sections 5 and 6 of the Donnelly Act together. Section 5 of the Donnelly Act, enacted in 1975, allows private suits by "any person who shall sustain damages by reason of any violation of this section" and creates the right to sue for treble damages. *See* N.Y. Gen. Bus. Law § 340(5) (McKinney 1975). This section further provides for a four year statute of limitations and expressly states that "[t]his section shall not apply to any action commenced prior to the effective date of this act." *Id.*

Section 6 of the Donnelly Act, which took effect on December 23, 1998, is the amendment at issue here. Unlike Section 5, Section 6 does not expressly state whether it is to be prospectively or retroactively applied. The Act amending § 340 of the Donnelly Act provides that:

> § 1. Section 340 of the general business law is amended by adding a new subdivision 6 to read as follows:
>
> 6. In any action pursuant to this section, the fact that the state, or any political subdivision or public authority of the state, or any person who has sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery; provided, however, that in any action in which claims are asserted against a defendant by both direct and

16

indirect purchasers, the court shall take all steps necessary to avoid duplicate liability, including but not limited to the transfer and consolidation of all related action.

§ 2. This act shall take effect immediately.

McKinney's Session Laws, 1998 Regular Session, Ch. 653, A. 4775 (Dec. 23, 1998).

Contrary to Plaintiff's arguments here, the critical element for determining indirect purchaser standing is not the date on which a Donnelly Act suit is commenced. Rather, it is the date on which a purchase is made. It is on that date that the antitrust injury is suffered, and the status of the purchaser is determined (direct or indirect). The law in effect on the purchase date thus determines whether the purchaser has standing to recover for his antitrust injury. The December 1998 amendment at issue here announced a substantive change in the law by taking away the prior no-standing defense, by creating a new right to sue on the part of indirect purchasers, and by affecting the pre-existing rights of direct purchasers by forcing them to share damages with indirect purchasers. It must, therefore, be applied prospectively to all purchases (antitrust injuries) that occurred after its effective date. Accordingly, Plaintiff cannot recover for antitrust damages resulting from pre-amendment purchases but can recover for damages resulting from post-amendment purchases. See *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1511376 (D. D.C. Oct. 6, 2000) (supporting a similar result). This result gives effect to the New York Legislature's purpose and intent in enacting § 340(6).

If the 1998 amendment is applied to Plaintiff's purchases (antitrust injuries) that were completed before its effective date, it would change pre-existing legal rights. This is true because the law in effect at the time those purchases were made (and thus in effect at the time those antitrust injuries were suffered) would have provided Defendants with a defense

17

that is not available after December 23, 1998. Likewise, an indirect purchaser who made purchases prior to that date would not have standing to sue for recovery under New York law as it existed at that time.

If, on the other hand, the 1998 amendment is applied to Plaintiff's purchases (antitrust injuries) completed after its effective date, there would be no alteration of pre-existing legal rights. The law in effect at the time those post-amendment purchases took place (and those antitrust injuries were suffered) no longer provides Defendants with a defense and instead grants Plaintiffs standing to sue for recovery under the Donnelly Act. See N.Y. Stat. § 51(a) (Comment) (observing that "[a] statute is not retroactive, however, when made to apply to future transactions, merely because such transactions relate to and are founded upon antecedent events.").

Plaintiff's reliance on the Legislature's expressed intent that the statute "take effect immediately" is misplaced. This language does nothing to advance Plaintiff's argument that the amendment has no retroactive effect when applied to pre-amendment purchases. Moreover, standing alone, this statement fails to establish legislative intent that a statutory amendment is to be retroactively applied. As the New York Court of Appeals has observed, "the date that legislation is to take effect is a separate question from whether the statute should apply to claims and rights then in existence." *Majewski*, 696 N.E.2d at 980 (citations omitted). "While the fact that a statute is to take effect immediately evinces a sense of urgency, the meaning of the phrase is equivocal in an analysis of retroactivity." *Id.* (internal quotes and citations omitted).

Contrary to Plaintiff's argument here, New York law provides that "an amendment will have prospective application only, and will have no retroactive effect unless the language

18

of the statute clearly indicates it shall receive a contrary interpretation." N.Y. Stat. Law § 52 (McKinney 1971). *See also In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, *15 (D.D.C. May 9, 2000) (citing statute and *Burns v. Volkswagen of Am., Inc.*, 460 N.Y.S.2d 410, 412 (N.Y. Sup. Ct. 1982)). *See also* N.Y. Stat. Law § 52 (Comment) (McKinney 1971) (observing that "a provision in an amendatory statute that 'this act shall take effect immediately' has been held to exclude the idea that it should be retroactive."). New York's 1998 *Illinois Brick* repealer amendment does not expressly provide that it is to be retroactively applied. Accordingly, New York law requires that this amendatory Act be prospectively applied. *See* N.Y. Stat. Law § 52.

### c. Whether the 1998 Amendment is a Remedial Statute

There is one exception to the general rule that amendments are to have prospective application only. Remedial statutes are given a retroactive application "but only to the extent that they do not impair vested rights." N.Y. Stat. Law § 54 (McKinney 1971). Plaintiff has not convinced the Court that the 1998 amendment is purely remedial and thus subject to retroactive application. While it is true that the 1998 amendment did not make unlawful conduct that was previously lawful, it does abolish a defense previously available against claims by indirect purchasers and, by granting indirect purchasers standing to sue, in effect creates a new cause of action. *See* N.Y. Stat. § 54 (McKinney 1971) (defining remedial statutes). Likewise, the Court is not convinced by Plaintiff's argument that § 340(6) reaffirmed original legislative intent and merely clarified that the Donnelly Act was always meant to allow indirect purchasers standing to sue. There is no express statutory language evincing this intent, and the legislative history does not provide clear support for

19