## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VISTA HEALTHPLAN, INC. and UNITED
FOOD AND COMMERCIAL WORKERS
CENTRAL PENNSYLVANIA HEALTH
AND WELFARE FUND, on behalf of themselves                    05 Civ. 2327 (CKK)
and all others similarly situated,

                    Plaintiffs,

v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., WARNER CHILCOTT CORP.,
WARNER CHILCOTT (US) INC., WARNER
CHILCOTT COMPANY, INC. and BARR
PHARMACEUTICALS, INC.,

                    Defendants.

_____/

## AFFIDAVIT OF KEVIN B. LOVE IN
## SUPPORT OF MOTION FOR FINAL APPROVAL

        BEFORE ME, the undersigned, personally appeared Kevin B. Love, and after being duly

deposed, sayeth as follows:

        1.        I am a partner in the law firm of Hanzman, Criden & Love, P.A. ("the Firm"). The

Firm represents Vista Healthplan, Inc. in this action, and was appointed Lead Counsel for the Third-

Party Payor Class. I make this Affidavit on personal knowledge and in support of Plaintiffs' Motion

for Final Approval of the Settlement of this Action, Class Counsel's request for attorneys' fees and

reimbursement of expenses, and for Class Counsel's request for incentive awards for the Class

Representatives.

### Class Counsel

        2.        Over the last ten years, my practice has to a large extent involved the representation

of plaintiffs in class actions.  The majority of these class actions have involved antitrust and

consumer-fraud claims.  I, and other members of my Firm, have served as court-appointed class

counsel in numerous class actions pending and concluded in both state and federal courts throughout the country. *See* Firm Resume attached hereto as Exhibit "1."

3.      In handling matters of this nature, the Firm fully understands and takes seriously its fiduciary obligations to the Class. In the numerous class-action matters we have handled (many of which were settled before trial), our integrity has never been called into question, either by an objector or by a Court. To the contrary, the Firm takes great pride in the fact that our professional competence and diligence have been commented upon favorably by a number of judges before whom we have appeared. For example, in *Walco v. Thenen*, 168 F.R.D. 315, 327 (S.D. Fla. 1996), Judge Federico Moreno, in certifying a class action, commented "that the experience and competency of Plaintiffs' counsel . . . is evident in both their pleadings and oral presentation to the Court."; *see also Luaces v. DirecTV, Inc.*, Case No. 97-2324 (S.D. Fla.) ("Professionalism is quite apparent in everything that I have reviewed in this file. . . . I feel blessed and flattered that I have before me counsel with unblemished reputations."); *Aylward v. PaineWebber*, Case No. 96-2831 (S.D. Fla.) ("It seems like this was an excellent result for all the members of the class, and it was a job well done."); *Shea v. New York Life Insurance Company*, Case No. 96-0746 (S.D. Fla.) ("I just don't think that just an ordinary firm, even one that specializes in class actions, could have done a better job. And all of this is, you know, requires ability, it requires skill and it requires being adroit at what you're doing. And not just the average attorney, I don't think, could have done it in such a skilled and proficient way. So the experience and reputation of the attorneys in this case are beyond question.").

### The Prosecution of the Litigation

4.      In December 2005, Plaintiffs filed the instant action – *Vista Healthplan, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* No. 1:05-02327 (CKK) ("Action") – on behalf of themselves

and all other Third Party Payors similarly situated, alleging antitrust, consumer protection and unjust enrichment claims against Defendants Warner Chilcott and Barr.  Plaintiffs alleged in their Complaint that Defendants entered into an unlawful agreement to prevent generic Ovcon 35 from reaching the market.  In particular, Plaintiffs alleged that on March 24, 2004, Defendants signed two agreements wherein Warner Chilcott paid Barr $20 million and in exchange Barr agreed to not market its generic Ovcon 35 product for five years.  Plaintiffs further alleged that, as a consequence of the agreements, no generic version of Ovcon 35 was launched until October 2006.

5.     Plaintiffs then alleged that Third Party Payors must have paid substantially more for Ovcon 35 than they would have paid had the generic Ovcon 35 come to market in May 2004. Warner Chilcott and Barr have denied, and continue to deny, that they committed any violation of law or engaged in any wrongdoing, and further deny that they have any liability with respect to any claims asserted in the Complaint and deny any and all liability to Plaintiffs and the Class.  Warner Chilcott and Barr also maintain that even if their acts did prevent a generic version of Ovcon 35 from coming to the market, Third Party Payors were not adversely affected because, among other reasons, the amount of money Third Party Payors saved on co-payments more than made up for any discount in the price of a generic Ovcon 35 product.

6.     Since the filing of this Complaint, Plaintiffs and Class Counsel have engaged in an extensive investigation relating to the claims and underlying events alleged in the Complaint. Among other things, Class Counsel have: (1) reviewed and analyzed over 800,000 documents produced by Warner Chilcott, Barr and third parties; (2) researched and analyzed issues relating to class certification, liability, causation and damages; (3) briefed substantive motions on liability and class certification; (4) deposed 27 different employees of Defendants (including the CEOs of both defendants); (5) defended four Plaintiff depositions; and (6) retained and consulted with economists

-3-

and other experts with respect to causation and damages allegedly sustained by the Class as a result of the wrongful conduct alleged in the Complaint. Class Counsel is therefore thoroughly familiar with issues of class certification, liability, causation and damages with respect to the claims asserted in the Complaint and defenses asserted by Warner Chilcott and Barr.

7.      Near the end of 2006, after a year of conducting extensive discovery, the Parties began to seriously discuss possible resolution of this dispute. Several months later, in April 2007, after numerous meetings (both in person and on the phone), the Parties agreed to settle this Action. It then took an additional month to hammer out the precise terms of the proposed settlement, leading to the execution of the Settlement Agreement on May 15, 2007.

8.      Under the Settlement Agreement, Warner Chilcott and Barr shall each donate branded combined hormonal contraceptive products with a retail value of $1,500,000 (for a total value of $3,000,000) throughout the United States to various charitable organizations and other healthcare providers within a three-year period to begin after the Effective Date of the Settlement Agreement.

9.      Specifically, Warner Chilcott and Barr must donate the products to one or more of the following: (1) charitable organizations providing reproductive healthcare services to women; (2) university health centers or clinics; or (3) primary care physicians not currently receiving samples of the products who, according to IMS data, prescribe combined hormonal contraceptives. *See* Section II of the Settlement Agreement.

10.     The Settlement comes at a good time for young women at universities who cannot afford birth control. A new federal law designed to save taxpayers money on Medicaid reimbursements for drugs has had the perverse effect of preventing pharmaceutical companies from selling their products to university clinics at deeply discounted rates. *See* News Article "A Jump in the Cost of Birth Control Puts Students in a Quandary," reported in October 11, 2007 edition of *U.S.*

*News and World Report*, attached hereto as Exhibit "2." The $3,000,000 worth of product will also have an indirect beneficial affect on some or all Third Party Payors. Some of the consumers that receive free product from this Settlement will inevitably be insured by Class Members, and the more free product their insureds receive, the less reimbursements those insurers will have to pay in connection with those products.

11.    Each product donated shall be valued at average retail price, as determined by an independent third party data source, for the one-year period preceding the donation or, if unavailable, the period since the product's launch. Warner Chilcott and Barr shall pay all costs associated with their respective donations. Finally, Warner Chilcott and Barr must provide certification to Class Counsel of its compliance with the Settlement Agreement's requirements for product donation on the one-, two-, and three-year anniversaries of the Settlement Agreement's Effective Date, setting forth, among other things, the value of the products donated in the preceding year and which entities received the product donations.

12.    After the $3,000,000 product donation was negotiated, the Parties then agreed to a $1,100,000 Fees Fund from which to pay Class Counsel reasonable attorneys' fees and costs associated with prosecuting this Action. Warner Chilcott and Barr also agreed to pay $50,000 each into a Costs Fund (for a total of $100,000) to pay the expenses associated with providing notice to the Class, settlement administration, and any Court-approved incentive payments.

13.    Counsel for the Parties, all of whom are experienced and knowledgeable antitrust and class-action attorneys, only reached the Settlement after extensive, heated, arm's-length negotiations, and only after substantial factual investigation and legal analysis of the claims and defenses of each Party.

14.    Furthermore, the settlement negotiations, conducted under the supervision of Magistrate Judge Alan Kay, were protracted, taking five months to reach an agreement.

### Strength of Plaintiffs' Case

15.    Defendants raised several defenses that, if accepted by the jury, would have made it more difficult for Plaintiffs to secure a favorable verdict as to Defendants' liability.  Among these defenses are: (1) the Option and Licence Agreement and the Finished Product Supply Agreement between Warner Chilcott and Barr were entered into for legitimate business reasons, namely because Warner Chilcott was allegedly experiencing serious supply problems with its current supplier of Ovcon 35; (2) Ovcon 35 competed with scores of other brand name and generic oral contraceptives supporting a broader market definition than alleged; and (3) the agreements at issue could have had no anticompetitive effect due to Warner Chilcott's heavy promotion and free sampling of Ovcon.

16.    Defendants also produced documents showing that over 40% of the "sales" of Ovcon 35 were free samples given out by Warner Chilcott.  Therefore, if Warner Chilcott could have proven that they would have stopped sampling Ovcon 35 had Barr's generic Ovcon 35 come to market in May 2004, one could conclude that Third Party Payors would have had to pay some or all of those new prescriptions for consumers no longer receiving free samples.

17.    Finally, Defendants were able to credibly argue that the Class did not in fact incur *any* aggregate damages, even without taking into account the free sampling issue.  In determining aggregate damages, each Party's expert would have to, among other things, calculate the discount that would have likely occurred had Barr's generic Ovcon hit the market in May 2004, as well as any co-payment differential.  "Co-payment differential" refers to the difference in the prices that a Third Party Payor's insureds would pay for a branded drug versus a generic drug.  Generally, co-payments for insureds are less for a generic drug, but Third Party Payors make up the difference because of the

-6-

decrease in the price of the generic drug. In some instances where the branded drug's price is low relative to its average co-payment schedule, it is possible that the co-payment difference would be more than the discount that the Third Party Payer gains on the generic drug, resulting in a Third Party Payor paying less overall for a branded drug compared to the equivalent generic product.

18.    Because Ovcon 35 was a relatively inexpensive drug, if one assumes a low discount and a high co-payment differential, a jury could conclude that Third Party Payors suffered little to no damages as a Class. Not only did Defendants vigorously pursue this argument, but the Plaintiffs in the consumer action took the same position. Although Plaintiffs continue to believe that Plaintiffs and the Class did in fact suffer some damages, there was a reasonable possibility that even if Plaintiffs proved liability, a jury could have still found that the Class as a whole suffered little to no damages.

## Reaction of the Class

19.    Over 41,000 notices were sent out to Class Members. Only one Third Party Payor objected to the Settlement. A copy of the objection is attached hereto as Exhibit "3."

20.    Given that the Class is made up of thousands of sophisticated managed care companies, the fact that only one objection was lodged against the Settlement supports the reasonableness of the Settlement. Moreover, the sole objector's assertion – that this case should not be settled without the Class being reimbursed for its damages – does not recognize that Defendants credibly argue that the Class suffered little to no damages, and that some Third Party Payors may have in fact benefitted from Defendants' alleged conduct. It is unclear from the objection if the Class Member analyzed its own data to discover whether it benefitted from Defendants' conduct.

21.    Not only were there no objections, but only fifty Third-Party Payors requested exclusion from the Class.  *See* Young Affidavit, attached to Motion for Final Approval as Exhibit "C".

### Motion for Fees and Expenses

22.    In its Motion for Attorneys' Fees and Expenses, Class Counsel has requested that the Court award the $1,100,000 in the Fees Fund as a reasonable attorney fee and cost reimbursement.

23.    As set forth in separate declarations attached as Exhibits "D" though "I" to the Motion for Final Approval, Class Counsel has spent a total of 4,575.40 hours prosecuting this Action.  Class Counsel's lodestar therefore totals $1,550,110.

24.    In addition to the time expended, Class Counsel also incurred expenses of $225,350.43.

25.    Thus, Class Counsel seeks $1,100,000 from the Fees Fund to reimburse them for over $1,700,000 in total lodestar and incurred costs.  Under the lodestar approach, Class Counsel's fee request is less than sixty percent of its time and costs.

### Incentive Award

26.    We have requested $12,500 incentive awards for Vista and United Food, for a total of $25,000 for both plaintiffs.  In the Notice, we informed all Class Members that we would be seeking up to $25,000 for the Class Representatives, and there were no objections.  We estimate that Vista and United Food each spent in excess of 50 hours assisting Class Counsel in prosecuting this Action.

27.    Out of the thousands of Third Party Payors around the country, only Vista and United Food were willing to take on Defendants in a distant forum.  Both Vista and United assisted Class Counsel in various essential tasks, including document production, depositions, participating in

-8-

discussions on damages with the expert, and taking part in the settlement negotiations. Finally, Plaintiffs took their fiduciary duties very seriously when, after weighing the pros and cons on the Action as understood after a year of discovery, they ultimately decided that it would be in the best interest of the Class to settle this Action for the $3 million product donation, thus depriving themselves of any opportunity to recover potential damages.

**FURTHER AFFIANT SAYETH NAUGHT.**

KEVIN B. LOVE

STATE OF FLORIDA          )
                          )
COUNTY OF MIAMI-DADE  )

The foregoing instrument was acknowledged before me this 23rd day of October, 2007, by KEVIN B. LOVE who is personally known to me and who did not take an oath.



Notary Public

Madeline T. Llanez
Typed, Printed or Stamped
Name of Notary

My Commission expires:

MADELINE T. LLANEZ
MY COMMISSION # DD 627576
EXPIRES: February 24, 2011
Bonded Thru Budget Notary Services

L:\103\Final Approval\KBL Affidavit.wpd

## HANZMAN CRIDEN & LOVE, P.A.

**HANZMAN CRIDEN & LOVE, P.A.** is a litigation firm of experienced trial lawyers that devotes a substantial amount of its practice to antitrust and consumer fraud class action litigation, securities and broker misconduct litigation and complex commercial litigation. A brief biography on the attorneys in the Firm is set forth below.

**Michael A. Hanzman** received his law degree from the University of Florida with honors and was admitted to the Florida Bar in 1985. Mr. Hanzman has successfully tried numerous complex commercial cases in state and federal courts. He also has arbitrated a considerable number of securities claims before the NASD, NYSE and AAA. Many of those cases have resulted in substantial compensatory and punitive damage awards. *See, e.g., Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir. 1995); *Palm Court, Inc. v. Durham,* No. 86-3885 (Fla. 15th. Cir.). Mr. Hanzman was one of three lawyers appointed by U.S. District Judge Federico Moreno to represent a class of approximately fifteen hundred defrauded investors in *Walco Investments, Inc. v. Kenneth Thenen,* No. 93-2534-Civ-Moreno (S.D. Fla.), which involved a Ponzi scheme in the grocery diverting business. Mr. Hanzman and his co-counsel in that matter recovered approximately $150 million on behalf of the investor class. Additionally, Mr. Hanzman was co-lead counsel in *Shea v. New York Life Ins. Co.,* Case No. 96-0746-Civ-Nesbitt (S.D. Fla.), in which investors in limited partnerships received a full refund of their investment, nearly $200 million.

Mr. Hanzman currently is Co-Lead Counsel in *Scheck Investments v. Kensington Mgmt, Inc.,* case No. 04-21160 (S.D. Fla.), representing thousands of defrauded investors who purchased hundreds of millions of dollars worth of viatical contracts from Mutual Benefits.

EXHIBIT 1

**Michael E. Criden** attended Temple University and Florida International University and graduated with highest honors, received his law degree from the University of Miami, also with honors, and was admitted to the Florida Bar in 1987. Mr. Criden is nationally recognized in the field of securities arbitration. On behalf of approximately three thousand individual investors, Mr. Criden has recovered over $100 million. Mr. Criden also has considerable experience in securities and other class actions involving consumer fraud and antitrust matters.

**Kevin B. Love** received his B.A. from Emory University in 1988. In 1991, he graduated *magna cum laude* from Boston University School of Law. After graduation, Mr. Love clerked for The Honorable Emmett R. Cox of the Eleventh Circuit Court of Appeals. Mr. Love then spent a year teaching Constitutional Law and Legal Writing at the University of Miami School of Law. Mr. Love began his practice with the law firm of Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, and later became a shareholder in 1997. Mr. Love's practice currently focuses on securities, consumer-fraud and antitrust class actions.

In October 2003, Mr. Love, as Lead Counsel in *Vista Healthplan, Inc. v. Bristol-Myers Squibb Co. and American Bioscience*, Case No. 1:01CV01295 (D.D.C.), an antitrust class action, recovered $15,000,000 in a settlement for a class of third-party payors. More recently, in February 2004, Mr. Love, as Lead Counsel, recovered $9,708,000 in *Johnson v. National Western Life Ins. Co.*, No. 01-032012-CP (Mich. Cir. Ct.), a consumer-fraud class action wherein it was alleged that National Western was selling inferior annuity products to the elderly. In recent years, Mr. Love has been instrumental in recovering additional millions of dollars in several antitrust and consumer fraud cases. *See, e.g., In re Buspirone Antitrust Litigation,* (S.D.N.Y.) ($90,000,000); *Ivax v. Aztec*

2

*Peroxides,* No. 02-0593 ($24,000,000); *Best v. Wilmington Trust Company*, Case No. 99-889-Civ-Jordan (S.D. Fla.) ($3,225,000); and *Gregersen v. One International Associates Limited Partnership*, C.A. No. 17274 (Del. Ch.) ($2,000,000). Mr. Love also was Lead Counsel for Third-Party Payors in *In re Remeron Antitrust End-Payor Antitrust Litigation*, responsible for allocating a $36 million settlement fund with several State Attorneys General who represented consumers and states agencies.

Currently, Mr. Love, as a member of the Plaintiffs' Steering Committee, is litigating *In re: Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.); *see also In re: DDAVP Indirect Purchaser Litigation*, No. 05-2237 (CLB) (S.D.N.Y.) (Co-Lead Counsel); *In re: Ovcon Indirect Purchaser Litigation*, No. 05-2327 (D.D.C.) (Chairman of Executive Committee for Third Party Payors); *In re: Bananas Antitrust Litigation*, No.: 05-21962 (S.D. Fla.) (Executive Committee). In addition, in May 2005, Mr. Love was appointed by the SEC to be the Distribution Agent for the Spear & Jackson SEC Disgorgement Fund ($7,500,000). In February 2007, Mr. Love was again appointed by the SEC as a Distribution Agent in for the SEC Grabarnick Disgorgement Fund.

**Josh Migdal**, an associate with the firm, received his B.A. from University of Wisconsin in 2002. In 2005, he graduated from Loyola University Chicago School of Law. At Loyola, Mr. Migdal received his Tax Certificate and was a member of the Business Law Clinic. Mr. Migdal's current practice focuses on consumer-fraud and antitrust class action.

* * *

**Below is a sample of some of the Class Actions that Hanzman Criden & Love, P.A. has served as lead counsel or in a leadership capacity:**

*Aylward v. PaineWebber, Case No. 96-2831-Civ-Lenard (S.D. Fla.)*
*Baron v. Best Buy Co., Case No. 99-1297-Civ-Jordan (S.D. Fla.)*

3

*Beacon Health Plans, Inc. v. Tap Pharmaceutical Products, Case No. 01-10897-RGS (D. Mass.)*
*Best v. Wilmington Trust Company, Case No. 99-889-Civ-Jordan (S.D. Fla.)*
*Ciprofloxacin Hydrochloride Antitrust Litigation, Master File No. 00-MDL-1383 (E.D. N.Y.)*
*Fabricant v. Sears Roebuck & Co., Case No. 98-1281-Civ-Nesbitt (S.D. Fla.)*
*Gonzalez v. Rooms to Go, Inc., Case No. 97-3146-Civ-Graham (S.D. Fla.)*
*Gregerson v. One International Associates, No. 17274 (Del. Ch. Ct.)*
*Grinshaw v. New York Life Ins. Co., Case No. 96-0746-Civ-Nesbitt (S.D. Fla.)*
*HIP Health Plan Of Fla, Inc. v. Bristol-Myers Squibb Co., Case No. 1:01CV560 (D. D.C.)*
*HIP Health Plan Of Fla, Inc. v. Schering-Plough Corp., Case No. 01-CV-1652 (JAG) (D. N.J.)*
*IVAX v. Microcrystalline Cellulose Antitrust Litigation, MDL1402 (O'Neill, J) (E.D. Pa.)*
*Kershaw v. National Western Life Insurance Company, Case No. 01-32012-CP (Mich. 6th Jud. Cir.)*
*King v. American National Ins. Co., Case No. 96-1074 (Ala. 15th Jud. Cir. )*
*Koch v. PLM International, Inc., Case No. 97-0177-BH (S.D. Ala.)*
*London v. Walmart Stores, Inc., Case No. 99-1298-Civ-Ungaro Benages (S.D. Fla.)*
*Medine v. Washington Mutual, Case No. 96-3362-Civ-Seitz (S.D. Fla.)*
*Ressler v. TransAmerica, Case No. 97-1215-Civ-Moreno (S.D. Fla.)*
*Scharlow v. Pensco Pension Services, Inc., Case No. 01-8364-Civ-Hurley (S.D. Fla.)*
*Singer v. AT & T, Case No 95-2738-Civ-Davis (S.D. Fla.)*
*Wegweiser v. Great Western Bank, Case No. 95-8543-Civ-Hurley (S.D. Fla.)*
*Walco Invs. Inc. v. Thenen, Case No. 93-2534-Civ-Moreno (S.D. Fla.)*

\* \* \*

The Firm's commitment to our clients' interests, as well as our professional competence and diligence, have been commented upon by various judges before whom the Firm has appeared.

In *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 327 (S.D. Fla. 1996), in certifying a class action, the Court commented "that the experience and competency of Plaintiffs' counsel in securities litigation is evident in both their pleadings and oral presentation to the Court," and noted that "Plaintiffs' counsel are experienced in securities litigation and have successfully prosecuted numerous securities cases in courts throughout the United States."

At the final fairness hearing on the settlement in *Luaces vs. DirecTV, Inc.*, Case No. 97-2324 (S.D. Fla), in which the Firm served as lead counsel for the class, District Judge Highsmith stated:

4

> I think both parties have done an exemplary job. Professionalism is quite apparent in everything that I have reviewed in this file.
>
> I feel blessed and flattered that I have before me counsel with unblemished reputations.  It makes it extremely easy.  I think you've done, as I said earlier, an excellent job.

In approving a $13 million settlement in *Aylward v. PaineWebber*, Case No. 96-2831 (S.D. Fla.), District Judge Lenard noted:

> It seems like this was an excellent result for all the members of the class, and it was a job well done . . .

In *Shea v. New York Life Ins. Co.*, Case No. 96-0746 (S.D. Fla.), upon approving a settlement valued at approximately $190,000,000 and representing a 100% recovery, Judge Nesbitt remarked:

> There is no question about it, it's an extraordinary settlement.
>
> The settlement represents an optimal, as the Plaintiffs say, recovery, and I think that's the right word, when compared not only with the range of recovery in other cases that have been summarized for me, but other cases in my experience.
>
> And I think that took extraordinary skill, expertise and knowledge about the market, about class actions, about the Defendants' business. I just don't think that just an ordinary firm, even one that specializes in class actions, could have done a better job . . . .  And all of this is, you know, requires ability, it requires skill and it requires being adroit at what you're doing. And not just the average attorney, I don't think, could have done it in such a skilled and proficient way.  So the experience and reputation of the attorneys in this case are beyond question.

5

The Firm maintains an excellent reputation among the plaintiff and defense bars. Our adversaries and co-counsel know that we are ready, willing and able to take on complex cases and class actions and take them to and through trial, if necessary, to achieve a satisfactory result for our clients.

* * *

# Health

## The Pill's Price on Campus
### A jump in the cost of birth control puts students in a quandary

*By Deborah Kotz*
Posted October 11, 2007

When Malia Mason went into her university health center last December to refill her birth control prescription, she got some shocking news: She'd soon be shelling out $42 for each four-week pill pack of Ortho Tri-Cyclen Lo, she was told, instead of her usual $14. The 19-year-old sophomore at the University of Pittsburgh filled the rest of her yearly prescription at the old price, but she finally ran out this month and will have to come up with an additional $360 a year. "That's the cost of my yearly electric bill or half my books for a semester," she says. "I haven't yet figured out what I'm going to do."



Malia Mason is paying three times what she used to for the pill. (Scott Goldsmith/Aurora for USN&WR)

University pharmacies nationwide have recently doubled or tripled the prices they charge for prescription contraceptives. A quirk in a new federal law, designed to save taxpayers money on Medicaid reimbursements for drugs, has effectively persuaded pharmaceutical companies to stop selling their products to these pharmacies at deeply discounted rates. (If companies continue to offer such discounts, the law stipulates, they will also receive lower payments from Medicaid.) As a result, 3 million college women who use birth control pills are now paying $30 to $50 each month for their favorite brand, up from an average of $5 to $10, according to the American College Health Association. "Some campuses had the resources to stockpile before the legislation took effect, but most are running out or have already run out," says Mary Hoban, who directs the ACHA's national college health assessment program office.

Clinics have already seen a drop-off in students filling prescriptions. The number of pill packs being dispensed at the University of North Carolina-Wilmington's student health center, for example, has fallen by a third since September, says pharmacist manager Ann Roth. Some health centers, like the one at Bowdoin College in Brunswick, Maine, have stopped stocking oral contraceptives altogether because they can't afford to maintain the pricier inventory. And many more are struggling to provide a full range of services because they can no longer rely on profits made from marking up the discounted products. The UNC health center used to earn about $5 to $10 from every pill pack sold, which subsidized physical exams, HIV testing, and medication counseling, says Roth.

One consequence could be a rise in unintended pregnancies, a major cause of college dropouts. What's more, without the incentive to get their yearly prescription renewed, fewer women are coming to health centers for gynecological exams, says Hoban. This means they also aren't getting screened for sexually transmitted diseases or being offered the new HPV vaccine, which can prevent cervical cancer. "We really have to get this issue fixed," says Cecile Richards, president of Planned Parenthood.

In the meantime, students can look for cheaper alternatives. Most university pharmacies now dispense generic oral contraceptives for $20 to $25 per pack. But about half a dozen brands of pills—as well as the vaginal insert NuvaRing and the patch—still have no generic equivalent, and some women may need to stay on a particular brand to avoid side effects like nausea, headaches, or frequent spotting, says Steven Sondheimer, a professor of obstetrics and gynecology at the University of Pennsylvania School of Medicine. Students covered by their parents' health insurance might get a price break, but they'll probably have to go off campus since most university clinics don't accept insurance. Planned Parenthood clinics are another option; the vast majority still offer reduced rates for brand-name contraceptives. Women can log on to plannedparenthood.org to find the nearest clinic, though they should call ahead, says Richards, to make sure it has the discount.

Student organizations are also trying to find ways to ease the financial burden. At the University of New Mexico, a group called Spiritual Youth for Reproductive Justice has been helping to subsidize the cost of contraception. So far, it has given eight students an average of $103 each. "But this shouldn't be the end solution," says Ambrosia Ortiz, 22, who served as vice president of the group before she graduated last year. Students at New Mexico and other schools nationwide are organizing call-in campaigns directed at legislators, in an effort to get the discounts reinstated. Mason hopes that change will come soon. "I've had friends go off

EXHIBIT 2

The Pill's Price on Campus - US News and World Report                                    Page 2 of 2

their birth control because they can't afford it," she says. "It's just completely ridiculous. If the government wants to promote safe sex on campus and no unintended pregnancy, they're really not sending a good message."

Tags: colleges | Medicaid | birth control
Tools: ⊠ Share

Copyright © 2007 U.S. News &World Report, L.P. All rights reserved.

# KRAKOW & SOURIS, LLC

ATTORNEYS AT LAW
225 FRIEND STREET
BOSTON, MASSACHUSETTS 02114

AARON D. KRAKOW
CHRISTOPHER N. SOURIS*
MELINA C. McTIGUE**

August 7, 2007

TELEPHONE (617) 723-8440
TELECOPIER (617) 723-8443
TOLL FREE (888) 628-8200

MICHAEL F. WALSH
OF COUNSEL

MARK G. KAPLAN
COLIN R. CONFOEY
OF COUNSEL

*ALSO ADMITTED IN NEW YORK
**ALSO ADMITTED IN PENNSYLVANIA

Clerk of Court
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

RE:    Ovcon 35 - Case No. 1:05-CV-02327 (CKK)

Dear Sir or Madam:

I am writing on behalf of my client, the New England Carpenters Health Benefits Fund. As fiduciaries of an employee benefit fund governed by the Employee Retirement Income Security Act of 1974, the trustees of the Fund feel that they must object to any settlement of this case that does not reimburse, in whole or in part, the excess amounts paid by the fund for Ovcon 35, or provide at least some form of benefit to the Fund and other class members.

The primary responsibility of fiduciaries of a plan governed by the Employee Retirement Income Security Act of 1974 is to act "solely in the interest of the participants and beneficiaries" of the plan. 29 U.S.C. §1104. Among the duties inherent in that responsibility is the safeguarding of plan assets, which includes the recovery, or attempted recovery, of amounts that the plan should not have spent.

The proposed settlement in this case is quite clearly in the interests of the defendants, the attorneys, and unidentified third parties, but offers no benefit whatsoever to the plaintiff class in return for its promise to relinquish its claims. The trustees believe that agreeing without objection to this settlement would not be consistent with their duty to safeguard the Fund's assets, and would not therefore be in the interests of the participants and beneficiaries of the Fund.

Very truly yours,

Melina C. McTigue

MCM:me
cc:    Kevin B. Love, Esq., Lead Counsel for the Class
       Peter C. Thomas, Esq., Counsel for Defendant Warner Chilcott
       Mark L. Kovner, Esq., Counsel for Defendant Barr
       Jim Buckley
       Harry Dow

# EXHIBIT 3