## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VISTA HEALTHPLAN, INC. and UNITED
FOOD AND COMMERCIAL WORKERS
CENTRAL PENNSYLVANIA HEALTH
AND WELFARE FUND, on behalf of themselves             05 Civ. 2327 (CKK)
and all others similarly situated,

        **Plaintiffs,**

v.

WARNER CHILCOTT HOLDINGS COMPANY
III, LTD., WARNER CHILCOTT CORP.,
WARNER CHILCOTT (US) INC., WARNER
CHILCOTT COMPANY, INC. and BARR
PHARMACEUTICALS, INC.,

        **Defendants.**

_____/


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR FINAL APPROVAL OF SETTLEMENT
## AND REQUEST FOR ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS

## TABLE OF CONTENTS

*Page No.*

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

II.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

III.  THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE IT IS FAIR,
      REASONABLE AND ADEQUATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

      A.   Approval of a Proposed Class-Action Settlement is Within the
           Sound Discretion of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

      B.   A Review of the Factors Generally Considered in this Circuit
           Weighs in Favor of Final Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

           1.   Whether the Settlement is the Result of Arm's-Length
                Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

           2.   The Terms of the Settlement in Relation to the Strength of
                Plaintiffs' Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

           3.   The Stage of the Litigation Proceedings at the Time of Settlement . . . . . . **12**

           4.   The Reaction of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

           5.   The Opinion of Experienced Counsel . . . . . . . . . . . . . . . . . . . . . **14**

IV.   THE SETTLEMENT CLASS SATISFIES THE REQUIREMENTS OF RULE 23 . . . . . **15**

      A.   Antitrust Claims Are Particularly Appropriate for Class Action
           Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

      B.   The Proposed Settlement Class Satisfies The Requirements of Rule
           23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

           1.   The Settlement Class is So Numerous that Joinder of
                all Members is Impracticable . . . . . . . . . . . . . . . . . . . . . . . . **17**

           2.   There Are Questions of Law and Fact Common to
                Each Member of the Settlement Class . . . . . . . . . . . . . . . . . . . . **18**

       **3.**     **The Representative Plaintiffs' Claims Are Typical of**
              **Third Party Payor Class Members' Claims** . . . . . . . . . . . . . . . . . . . . . . . . **20**

       **4.**     **The Representative Plaintiffs Will Fairly and**
              **Adequately Represent the Settlement Class** . . . . . . . . . . . . . . . . . . . . . . . . **21**

   **C.**    **The Proposed Class Satisfies the Requirements of Rule 23(b)(3)** . . . . . . . . . . . . **22**

       **1.**     **Common Questions Of Law and Fact Predominate** . . . . . . . . . . . . . . . . . . **23**

       **2.**     **A Class Action is Superior to Other Available**
              **Methods for the Fair and Efficient Adjudication of**
              **This Controversy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**V.**     **THE COURT SHOULD AWARD CLASS COUNSEL REASONABLE ATTORNEYS'**
       **FEES AND COSTS, AND AWARD THE CLASS REPRESENTATIVES INCENTIVE**
       **AWARD** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

   **A.**    **Reasonable Attorneys' Fees and Costs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

       **1.**     **Lodestar Approach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

       **2.**     **Common Fund Approach** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

           **(i)**     **Size of the Fund Created and**
                   **the Number of Persons Benefitted** . . . . . . . . . . . . . . . . . . . . . . . . . **28**

           **(ii)**    **Number of Objections to Fees** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

           **(iii)**   **Skill and Efficiency of Counsel** . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

           **(iv)**   **Complexity and Duration of the Litigation** . . . . . . . . . . . . . . . . . . . **29**

           **(v)**    **The Risk of Non-Payment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

           **(vi)**   **Amount of Time Devoted by Counsel** . . . . . . . . . . . . . . . . . . . . . . . **29**

           **(vii)**  **Fee Awards in Similar Cases** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

   **B.**    **The Court Should Grant Incentive Awards to the Class Representatives** . . . . . . . **30**

**VI.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## I.    __INTRODUCTION__

Plaintiffs Vista Healthplan, Inc. ("Vista") and United Food and Commercial Workers Central Pennsylvania and Regional Health and Welfare Fund ("United Food") (collectively, "Plaintiffs") submit this memorandum in support of their Motion For Final Approval of Settlement and Request for Attorneys' Fees, Costs and Incentive Awards ("Motion for Final Approval").  In the Motion for Final Approval, Plaintiffs seek an order which: (1) grants final approval to the Settlement Agreement ("Settlement Agreement" or "Settlement")[1] between the Third Party Payor Class and Defendants Warner Chilcott Holdings Company III, Ltd., Warner Chilcott Corporation, Warner Chilcott (US) Inc. and Warner Chilcott Company, Inc. (collectively, "Warner Chilcott") and Barr Pharmaceuticals ("Barr") (collectively, "Defendants"); (2) approves the payment of attorneys' fees and reimbursement of expenses; and (3) grants the payment of incentive awards to Vista and United Food for prosecuting this Action.

As detailed below, because the terms of Settlement are fair, reasonable and adequate, and are in the best interests of the Class, the Court should approve the Settlement Agreement, authorize the payment of attorneys' fees, and grant incentive awards to the Plaintiffs.

## II.    __BACKGROUND__

In December 2005, Plaintiffs filed the instant action – *Vista Healthplan, Inc. v. Warner Chilcott Holdings Co. III, Ltd.,* No. 1:05-02327 (CKK) ("Action") – on behalf of themselves and all other Third Party Payors similarly situated, alleging antitrust, consumer protection and unjust

---

[1] The Settlement Agreement is attached as Exhibit 1 to Plaintiffs' Motion for Preliminary Approval of Settlement.  All capitalized terms are used as defined in the Settlement Agreement.

enrichment claims against Defendants Warner Chilcott and Barr. Plaintiffs alleged in their Complaint that Defendants entered into an unlawful agreement to prevent generic Ovcon 35 from reaching the market. In particular, Plaintiffs alleged that on March 24, 2004, Defendants signed two agreements wherein Warner Chilcott paid Barr $20 million and in exchange Barr agreed to not market its generic Ovcon 35 product for five years. Plaintiffs further alleged that, as a consequence of the agreements, no generic version of Ovcon 35 was launched until October 2006.

Plaintiffs further alleged that Third Party Payors must have paid substantially more for Ovcon 35 than they would have paid had the generic Ovcon 35 come to market in May 2004. Warner Chilcott and Barr have denied, and continue to deny, that they committed any violation of law or engaged in any wrongdoing, and further deny that they have any liability with respect to any claims asserted in the Complaint and deny any and all liability to Plaintiffs and the Class. Warner Chilcott and Barr also maintain that even if their acts did prevent a generic version of Ovcon 35 from coming to the market, Third Party Payors were not adversely affected because, among other reasons, the amount of money Third Party Payors saved on co-payments more than made up for any discount in the price of a generic Ovcon 35 product.

Since the filing of this Complaint, Plaintiffs and Class Counsel have engaged in an extensive investigation relating to the claims and underlying events alleged in the Complaint. Among other things, Class Counsel have: (1) reviewed and analyzed over 800,000 documents produced by Warner Chilcott, Barr and third parties; (2) researched and analyzed issues relating to class certification, liability, causation and damages; (3) briefed substantive motions on liability and class certification; (4) deposed 27 different employees of Defendants (including the CEOs of both defendants); (5)

defended four Plaintiff depositions; and (6) retained and consulted with economists and other experts with respect to causation and damages allegedly sustained by the Class as a result of the wrongful conduct alleged in the Complaint. Class Counsel is therefore thoroughly familiar with issues of class certification, liability, causation and damages with respect to the claims asserted in the Complaint and defenses asserted by Warner Chilcott and Barr.

Near the end of 2006, after a year of conducting extensive discovery, the Parties began to seriously discuss possible resolution of this dispute. Several months later, in April 2007, after numerous meetings (both in person and on the phone), the Parties agreed to settle this Action. It then took an additional month to hammer out the precise terms of the proposed settlement, leading to the execution of the Settlement Agreement on May 15, 2007.

### Settlement Agreement

Under the Settlement Agreement, Warner Chilcott and Barr shall each donate branded combined hormonal contraceptive products with a retail value of $1,500,000 (for a total of $3,000,000) throughout the United States to various charitable organizations and other healthcare providers within a three-year period to begin after the Effective Date of the Settlement Agreement.[2] Specifically, Warner Chilcott and Barr must donate the products to one or more of the following: (1) charitable organizations providing reproductive healthcare services to women; (2) university health centers or clinics; or (3) primary care physicians not currently receiving samples of the products who,

---

[2] "Effective Date" is defined in the Settlement Agreement as "the later of: (i) five (5) calendar days after the date when no appeal or reargument can be taken from the Final Judgment as defined herein; or (ii) if an appeal is taken or a review is sought from the Final Judgment, five (5) calendar days after the date when no subsequent appeal, motion for reargument or petition for certiorari can be taken from an order determining that the Final Judgment is final." *See* Section 1.I. of Settlement Agreement.

according to IMS data, prescribe combined hormonal contraceptives. *See* Section II of the Settlement Agreement.

Each product donated shall be valued at average retail price, as determined by an independent third party data source, for the one-year period preceding the donation or, if unavailable, the period since the product's launch. Warner Chilcott and Barr shall pay all costs associated with their respective donations. Finally, Warner Chilcott and Barr must provide certification to Class Counsel of its compliance with the Settlement Agreement's requirements for product donation on the one-, two-, and three-year anniversaries of the Settlement Agreement's Effective Date, setting forth, among other things, the value of the products donated in the preceding year and which entities received the product donations.

In addition to the $3,000,000 product donation, Warner Chilcott and Barr also created a $1,100,000 Fees Fund from which to pay Class Counsel reasonable attorneys' fees and costs associated with prosecuting this Action. Warner Chilcott and Barr also paid $50,000 each into a Costs Fund (for a total of $100,000) to pay the expenses associated with providing notice to the Class, settlement administration, and any Court-approved incentive payments.

### *Preliminary Approval*

On June 27, 2007, the Court granted preliminary approval of the Settlement. Pursuant to the Preliminary Approval Order, Complete Claims Solutions ("CCS"), the Settlement Administrator, sent out 41,716 notices to Third Party Payors across the country.[3] In addition, CCS developed and

---

[3] *See* Affidavit of Charlene Young Regarding Mailing of Notice of Pendency of Class Action, Proposed Settlement and Fairness Hearing at ¶ 12 ("Young Affidavit"), attached as Exhibit "C" to the Motion for Final Approval.

maintained a website (www.ovcon35tppsettlement.com) to provide information about the Settlement.   Summary Notice was also published in the national edition of *The National Underwriter*.   Young Affidavit at ¶¶ 7-9, 13.  The notice program fully apprised Class Members as to the content of the Settlement and their rights under the Settlement, including the right to opt-out or to object.  The deadline for objecting to, or opting out of, the Settlement was August 27, 2007.  Although the Class included thousands of Third Party Payors, only one Class Member objected to the Settlement, and only 50 Class Members opted out.

## III.    THE COURT SHOULD APPROVE THE SETTLEMENT BECAUSE IT IS FAIR, REASONABLE AND ADEQUATE

### A.    Approval of a Proposed Class-Action Settlement is Within the Sound Discretion of the Court

Rule 23 provides that:

> The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.

Fed. R. Civ. P. 23(e)(1)(C).

Approval of a class action settlement lies within the Court's discretion.  *In re: Vitamins Antitrust Litigation v. Chinook Group, Ltd.*, 2001 WL 856290, at *1 (D.D.C. July 19, 2001).  The exercise of this discretion, however, "is constrained by the principle of preference favoring and encouraging settlement in appropriate cases." *Id.; Pigford v. Glickman*, 185 F.R.D. 82, 103 (D.D.C. 1999).

**B.      A Review of the Factors Generally Considered
in This Circuit Weighs in Favor of Final Approval**

In this circuit, district courts generally evaluate the following factors in determining whether a settlement should be approved: (1) whether the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to the strength of plaintiffs' case; (3) the stage of the litigation proceedings at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel. *See In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 375 (D.D.C. 2002); *Chinook Group*, 2001 WL 856290, at *1. As shown below, each of these factors weighs in favor of final approval.

**1.      Whether the Settlement Is the Result of Arm's-Length Negotiations**

Under the terms of the Settlement, Warner Chilcott and Barr shall collectively donate a total of $3,000,000 of branded hormonal contraceptive products to settle the claims of the Class. Counsel for the Parties, all of whom are experienced and knowledgeable antitrust and class-action attorneys, only reached the Settlement after extensive, heated, arm's-length negotiations, and only after substantial factual investigation and legal analysis of the claims and defenses of each Party. *See* Affidavit of Kevin B. Love at ¶¶ 1-14, attached to Motion for Final Approval as Exhibit "B." Furthermore, the settlement negotiations, conducted under the supervision of Magistrate Judge Alan Kay, were protracted, taking five months to reach an agreement. There is nothing in the course of the negotiations or on the face of the Settlement that discloses grounds to doubt its fairness. The Court should therefore find "that the Settlement at issue was the result of arms' length negotiations and is therefore presumptively fair, adequate and reasonable." *Chinook Group*, 2001 WL 856290, at * 2.

**2.  The Terms of the Settlement in Relation to the Strength of Plaintiffs' Case**

Although Plaintiffs continue to believe that they could have succeeded had this action gone to trial, Plaintiffs faced several significant substantive and procedural obstacles that would have to be overcome before Plaintiffs and the Class could establish liability or recover damages.

First, antitrust conspiracy cases are complex and difficult, and victory is never guaranteed. *See, e.g., In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 372 (N.D. Ohio 1983) (noting recognized difficulties of proof and requirements of a costly trial on the merits and approving settlement); *In re Cement & Concrete Antitrust Litig.*, 1981 WL 2039, at *3 (D. Ariz. 1981) (recognizing "complexity and uncertainty" of legal and factual issues in antitrust case and approving settlement); *In re Fine Paper Antitrust Litig.*, 1979 WL 1743, at *2 (E.D. Pa. 1979).  As one court noted in the context of complex litigation, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) (citing instances in which settlements were rejected by the court and plaintiffs ultimately lost at trial or recovered less than settlement amount).

Second, the Complaint has not even been tested yet to see whether Plaintiffs state a claim or have standing to bring this Action.  Defendants contend in their motion to dismiss (not ruled upon by this Court) that the Complaint should be dismissed because, among other things, Plaintiffs lack standing to bring this Action, Plaintiffs fail to state a claim under the antitrust statutes of the District of Columbia and several other states, and Plaintiffs are barred from bringing an unjust enrichment claim under *Illinois Brick*.   Although Plaintiffs believe that had the Court ruled on the motion to dismiss, many of their claims would have remained, that outcome was far from certain.

-10-

Furthermore, even if Plaintiffs were to overcome the motion to dismiss, there is no guarantee that Plaintiffs' claims would have survived a motion for summary judgment. Similarly, there was no guarantee that this case would be certified if litigated. Plaintiffs' Motion for Class Certification was withdrawn prior to being ruled upon once the Parties began their settlement discussions.

Third, Defendants raised several defenses that, if accepted by the jury, would have made it more difficult for Plaintiffs to secure a favorable verdict as to Defendants' liability. Among these defenses are: (1) the Option and Licence Agreement and the Finished Product Supply Agreement between Warner Chilcott and Barr were entered into for legitimate business reasons, namely because Warner Chilcott was allegedly experiencing serious supply problems with its current supplier of Ovcon 35; (2) Ovcon 35 competed with scores of other brand name and generic oral contraceptives supporting a broader market definition than alleged; and (3) the agreements at issue could have had no anticompetitive effect due to Warner Chilcott's heavy promotion and free sampling of Ovcon 35.[4] *See also* Consumers' Memorandum in Support of Final Approval filed in *Cohen v. Warner Chilcott*, Case No. 06-401 (D.D.C. filed Oct. 2, 2007).

Finally, and most important, Defendants were able to credibly argue that the Class did not in fact incur *any* aggregate damages, even without taking into account the free sampling issue. In determining aggregate damages, each Party's expert would have to, among other things, calculate the discount that would have likely occurred had Barr's generic Ovcon hit the market in May 2004,

---

[4] Defendants produced documents showing that over 40% of the "sales" of Ovcon 35 were free samples given out by Warner Chilcott. Therefore, if Warner Chilcott could have proven that they would have stopped sampling Ovcon 35 had Barr's generic Ovcon 35 come to market in May 2004, one could conclude that Third Party Payors would have had to pay some or all of those new prescriptions for consumers no longer receiving free samples. *See* Love Aff. at ¶ 16.

as well as any co-payment differential. *See* Love Aff. at ¶¶ 17-18. Because Ovcon 35 was a relatively inexpensive drug, if one assumes a low discount and a high co-payment differential, a jury could conclude that Third Party Payors suffered little to no damages as a Class. *Id.* Not only did Defendants vigorously pursue this argument, but the Plaintiffs in the consumer action took the same position. Although Plaintiffs continue to believe that Plaintiffs and the Class did in fact suffer some damages, there was a reasonable possibility that even if Plaintiffs proved liability, a jury could have still found that the Class as a whole suffered little to no damages. Under these circumstances, settling for $3,000,000 worth of product donations should be considered a fair, reasonable and adequate resolution of this Action.[5] *See, e.g., In re: Children's Ibuprofen Oral Suspension Antitrust Litig.*, Case No. 04-535 (D.D.C. 2006) (approving settlement of $3,000,000 product donation); *Freeport Partners v. Allbritton*, 2006 WL 627140, at *10 (D.D.C. March 13, 2006) (plaintiffs' characterization of case as "resting on shaky grounds" seemed to the court "charitable at best.").

### 3. The Stage of the Litigation Proceedings at the Time of Settlement

At the time of Settlement, this case had been litigated for 18 months. By that time, Plaintiffs had fully briefed their opposition to Defendants' motion to dismiss, had fully briefed their motion for class certification, reviewed over 800,000 documents, taken the depositions of 27 different individuals, defended four depositions, and retained an expert to testify on class certification and damages. Having completed this discovery, Plaintiffs then participated in over five months of negotiations and further investigation before reaching a settlement with the Defendants. Spending

---

[5] Plaintiffs also observe that the $3,000,000 worth of product will have an indirect beneficial affect on some or all Third Party Payors. Some of the consumers that receive free product from this Settlement will inevitably be insured by Class Members, and the more free product their insureds receive, the less reimbursements those insurers will have to pay in connection with those products. Love Aff. at ¶ 10.

any more time litigating this action would only have increased the costs of litigation and extended the time for an uncertain recovery. *See Chinook Group,* 2001 WL 856290, at *2 (given that the settlement was the result of more than three years of investigation and litigation, the court found that the settlement was not too early to be suspicious nor too late to be a waste of resources). At the time of settlement, both sides possessed well-considered views of the merits of the case and the potential for, and likely amount of, any damages recovery. *See Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 305 (D.D.C. 1996) (finding significant that counsel had "an adequate appreciation of the merits of the case"); *Freeport Partners*, 2006 WL 627140, at *10 (because it was clear that plaintiffs faced significant obstacles to establishing liability and damages, an early settlement offered clear advantages to the class).

### 4. The Reaction of the Class

Pursuant to the Preliminary Approval Order, Complete Claims Solutions ("CCS"), the Settlement Administrator, sent out 41,716 notices to Third Party Payors across the country. In addition, CCS developed and maintained a website (www.ovcon35tppsettlement.com) to provide information about the Settlement. Finally, Summary Notice was published in the national edition of *The National Underwriter. See* Young Affidavit at ¶¶ 6-13.

In response, only one objection was received.[6] Given that the Class is made up of thousands of sophisticated managed care companies, the fact that only one objection was lodged against the Settlement supports the reasonableness of the Settlement. Moreover, the sole objector's assertion – that this case should not be settled without the Class being reimbursed for its damages – does not

---

[6] The sole objection is attached to the Love Aff. as Exhibit "3."

recognize that Defendants credibly argue that the Class suffered little to no damages, and that some Third Party Payors may have in fact benefitted from Defendants' alleged conduct. It is unclear from the objection if the Class Member analyzed its own data to discover whether it benefitted from Defendants' conduct. Of course, if the objector believed that it had indeed suffered damages, nothing prevented the objector from excluding itself (like its fellow 50 Class Members who opted out) and bringing its own lawsuit against Defendants. *See* Young Affidavit at ¶ 14.

Given the sophistication of the individual Class Members, the lack of any significant objections here strongly favors final approval. *Freeport Partners*, 2006 WL 627140, at *10 ("That the class reacted to the proposed settlement with virtually unqualified support, presenting no substantive objection to it, strongly suggests that it is fair, reasonable, and adequate."); *In re: Lorazepam*, 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) ("The existence of even a relatively few objections certainly counsels in favor of approval.").

### 5. The Opinion of Experienced Counsel

In approving class settlements, courts have repeatedly and expressly deferred to the judgment of experienced counsel who have conducted arm's-length negotiations. *See, e.g., In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 424-25 (S.D. Tex. 1999) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993). The presumption in favor of such settlements reflects the court's understanding that vigorous negotiation between seasoned and experienced counsel protects against collusion and advances the fairness concerns underlying Rule 23(e).

The settlement proposed here – which was negotiated over several months on behalf of the Class by experienced antitrust counsel – is the product of extensive arm's-length negotiations undertaken in good faith, after substantial factual investigation and legal analysis. Nothing in the course of the negotiations or the substance of the settlements discloses grounds to doubt its fairness. To the contrary, the arm's-length nature of the negotiations and the participation of experienced advocates throughout the process strongly support the conclusion that the proposed settlement is fair, reasonable and adequate.

* * *

For the foregoing reasons, Plaintiffs request that the Court grant final approval of the Settlement.

## IV.    THE SETTLEMENT CLASS SATISFIES ALL OF THE REQUIREMENTS OF RULE 23

Rule 23 governs the issue of class certification, whether the proposed class is a litigation class or, as here, a settlement class. *See Amchem Products v. Windsor*, 521 U.S. 591, 593 (1997); *Thomas v. Albright*, 139 F.3d 227, 234 (D.C. Cir. 1998). All the criteria for certification of a class for litigation purposes, except manageability, apply to certification for settlement purposes. Thus, a settlement class should be certified where the four requirements of Rule 23(a) – numerosity, commonality, typicality and adequacy – are satisfied, as well as one of the three subsections of Rule 23(b). *See Thomas v. Christopher*, 169 F.R.D. 224, 236 (D.D.C. 1996). The proposed Class meets these requirements.

### A.    Antitrust Claims Are Particularly Appropriate for Class Action Treatment

Class actions are widely recognized as being particularly appropriate for the litigation of antitrust cases because anticompetitive conduct "presumably impact[s] all purchasers in the affected market, so that common questions on the issue of liability predominate." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C. 2001) (citing *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, at *2 (E.D. Pa. Mar. 20, 1998)).

Additionally, as described above, the claims of Third Party Payors may involve a small amount of damages, creating a disincentive to bring an individual suit. As the Supreme Court noted in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997):

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

(quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)); *see also Minn. v. U.S. Steel Corp.*, 44 F.R.D. 559, 572 (D. Minn. 1968) ("Few are the individual claimants with a sufficient interest at stake or resources to bring a suit requiring proof of a conspiracy among business corporations."). Without the class action device, most of the victims of defendants' alleged anticompetitive conduct in this case, who could not afford independent representation, would have been deprived of a fair adjudication of their claims. "Although a given institution could conceivably have a claim substantial enough to warrant a separate action, the relatively small claims in many cases might render litigation impracticable." *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 278 (D.D.C. 1972); s*ee also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 527

(S.D.N.Y. 1996). Not surprisingly, therefore, federal courts have routinely certified classes in antitrust cases involving monopolies, *see*, *e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (Chief Judge Hogan certified class of direct purchasers of generic anti-anxiety drugs); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001); *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), and horizontal agreements between competitors. *See*, *e.g.*, *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999).

**B.**    **The Proposed Settlement Class Easily Satisfies the Requirements of Rule 23(a)**

    **1.**    **The Settlement Class Is So Numerous That Joinder of All Members Is Impracticable**

Under Rule 23(a)(1) the class must be so numerous that joinder of all members is "impracticable." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 477. A complaint need not allege the exact size of the proposed class nor the identity of the class members. *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D. Ill. 1992); *In re VMS Sec. Litig.*, 136 F.R.D. 466, 473 (N.D. Ill. 1991); *Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 524 (N.D. Ill. 1988). Instead, a finding of numerosity may be supported by common sense assumptions. *Scholes*, 143 F.R.D. at 184; *Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D. Pa. 1989); *In re Chlorine and Caustic Soda Litig.*, 116 F.R.D. 622, 625 (E.D. Pa. 1987). "Impracticable" does not mean impossible; showing a strong hardship or inconvenience may be sufficient. *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 477. In reviewing the practicability of joinder under Rule 23(a)(1), the size of the proposed class is a key factor. "In the District of Columbia, numbers of class members from 200 to 400 have sustained the numerosity requirement." *Vargas v. Meese*, 119 F.R.D. 291, 293 (D.D.C. 1987).

Numerosity cannot be seriously contested in this case. Warner Chilcott's 2006 sales of Ovcon were approximately $70 million per year, and the proposed Class numbers in the thousands. Classes numbering in the hundreds "have routinely satisfied the numerosity requirement." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 477 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785-86; *Hedges Enters., Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 465 (E.D. Pa. 1979)). Further, Settlement classes numbering in the thousands have been found not to pose manageability concerns and have been certified. *Chinook Group,* 2001 WL 856292, at *2. *See, e.g., In re Newbridge Networks Sec. Litig.,* 926 F. Supp. 1163, 1175-76 (D.D.C. 1996) (certifying class consisting of "thousands" of members).

Moreover, members of the Class are geographically dispersed throughout the United States. *See Pigford v. Glickman*, 182 F.R.D. 341, 348 (D.D.C. 1998). "Joinder of this number of geographically dispersed entities would be impracticable because some members would be unable to assume the financial burdens associated with litigating individual antitrust lawsuits, and because some members have relatively small claims, rendering it unlikely and unfeasible, in an economic sense, for them to bring individual claims." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 477. Accordingly, the numerosity requirement is satisfied.

### 2. There Are Questions of Law and Fact Common to Each Member of the Settlement Class

Rule 23(a)(2) requires only that there be some questions of law or fact common to the class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Accordingly, the commonality requirement has been

aptly characterized as a "low hurdle easily surmounted." *Scholes*, 143 F.R.D. at 185 (quotations and citations omitted); *see also Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Antitrust cases, by their nature, deal with common legal and factual issues. *See, e.g., Ballard v. Blue Shield of S.W. Va., Inc.* 543 F.2d 1075, 1080 (4th Cir. 1976) ("Class actions are frequently maintained in antitrust cases because of the many questions of law and fact that are common to the members of the class."); *Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 128 (S.D.N.Y. 1978) ("The monopolization claims are contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. These issues, along with others, are questions that are undoubtedly common to all members of the putative class.") (citations omitted). Also, "[t]he weight of authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class." *Sebo v. Rubenstein,* 188 F.R.D. 310, 314 (N.D. Ill. 1999) (citation omitted).

In this case, there are several issues of law and fact common to each Class Member, including, among others:

> a.      whether Defendants entered into agreements not to compete in the sale of Ovcon 35 and its generic equivalents;
>
> b.      whether Defendants' agreements not to compete were unlawful;
>
> c.      whether Defendants' conduct caused Plaintiffs and the other members of the Class to pay more for Ovcon 35 than they would have paid absent Defendants' conduct; and

    d.     whether Defendants' conduct caused Plaintiffs and the Class damages, and if so, the appropriate measure of damages.

Based on the above, it is clear that the commonality requirement is satisfied in this case.

### 3. The Representative Plaintiffs' Claims Are Typical of Third Party Payor Class Members' Claims

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Typicality focuses on "whether the individual claim of the class representatives has the essential characteristics common to the claims of the class." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. at 479. A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) *(*quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)), *cert. denied*, 506 U.S. 1051 (1993); *In re VMS Sec. Litig.*, 136 F.R.D. at 475. "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." 1 H. Newberg & A. Conte, Newberg On Class Actions § 3.13, at 3-76 (3d ed. 1992) ("Newberg"); *see also NASDAQ*, 169 F.R.D. at 511 (factual differences among class members do not defeat class certification where all claims arise from the same price-fixing conspiracy); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 699 (N.D. Ga. 1991) (typicality requirement satisfied even though the 12.5 million class members purchased tickets for an enormous number of different routes, at diverse times, at a multitude of varying prices, and on diverse terms). Courts have construed the

typicality requirement liberally. *See Scholes*, 143 F.R.D. at 185; *Mersay v. First Republic Corp. of Am.*, 43 F.R.D. 465, 468 (S.D.N.Y. 1968).

In this case, Plaintiffs' claims are unquestionably typical of the claims of the Class it seeks to represent. Vista and United Food contend that they were injured in their business or property by Defendants' antitrust violations. Plaintiffs' claims are typical because their claims, just like the absent Class Members' claims, all arise from the same course of conduct (Defendants' alleged agreement in restrain of trade) and all are based on the same legal theory (that such conduct violates Section 1 of the Sherman Act). Thus, the typicality requirement is satisfied.

### 4.    The Representative Plaintiffs Will Fairly and Adequately Represent the Settlement Class

The final requirement of Rule 23(a) is that the representative parties fairly and adequately represent the class.

> Two criteria for determining the adequacy of representation are generally recognized: (1) the named representative must not have antagonistic or conflicting interests with unnamed members of the class, and (2) the representatives must appear to be able to vigorously prosecute the interests of the class through qualified counsel.

Fed. R. Civ. P. 23(a)(4); *Nat'l Ass'n of Reg'l. Med. Program v. Mathews,* 551 F.2d 340, 345 (D.C. Cir. 1976) (citations omitted), *cert. denied*, 431 U.S. 954 (1977); *see Sosna v. Iowa*, 419 U.S. 393, 403 (1975) (holding that where it is unlikely that segments of the class would have interests conflicting with the class representative, and where the interests of the class have been competently urged at each level of the proceeding, the test of Rule 23(a)(4) has been met).

Here, the interests of the Plaintiffs, Vista and United Food, are aligned with the interests of the other Class Members because they have all been injured by the same anticompetitive conduct.

Plaintiffs do not have any interests antagonistic to those of the other Class Members. The central issues for the conspiracy claims – the existence, duration and effect of Warner Chilcott's agreements with Barr – are also common to the claims of Plaintiffs and the other members of the proposed Class. Plaintiffs have the same interest as each of the other Class Members in proving each of these elements. Proof of these elements by Plaintiffs will necessarily support the claims of other Class Members.

Plaintiffs are represented by qualified and experienced antitrust class action lawyers so "there is no ground for supposing that plaintiffs will not adequately represent the class." *In re Glassine & Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 303, 306 (E.D. Pa. 1980).

### C.  The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

Once the four prerequisites of Rule 23(a) are met, the Class must also satisfy at least one provision of Rule 23(b). *Thomas v. Albright*, 139 F.3d 227, 234 (D.C. Cir.), *cert. denied*, 525 U.S. 1033 (1998). Pursuant to Rule 23(b)(3), class certification is appropriate where "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see Thomas*, 139 F.3d at 234; *In re VMS Sec. Litig.*, 136 F.R.D. at 479. As the Supreme Court has observed, "predominance [of common issues] is a test readily met in certain cases . . . involving violations of antitrust laws." *Amchem Products. v. Windsor*, 521 U.S. 591, 625 (1997). Here, the proposed Third Party Payor Class clearly satisfies Rule 23(b)(3).

### 1.    Common Questions of Law and Fact Predominate

Rule 23 requires only that common issues predominate, not that they be dispositive of the entire litigation.  *See, e.g.*, *Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 4 (D.D.C. 1992) ("common issues need not be exclusive, but must only predominate over individual concerns").  The Supreme Court has recognized that "predominance is a test readily met in certain cases alleging consumer or securities fraud or *violations of the antitrust laws*." *Amchem Prods., Inc.*, 521 U.S. at 625 (emphasis added).  *See Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417, 427 (D.N.M. 1988) ("[t]he common questions of law, the elements of the monopolization claim . . . dwarf, rather than merely predominate over, any individual questions"); *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 149 (E.D. Pa. 1976) ("[I]n Section 1 Sherman Act cases, the existence *vel non* of a conspiracy has been recognized as an overriding issue common to the plaintiff class.").  "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *NASDAQ*, 169 F.R.D. at 517 (citations omitted).

Courts addressing such conspiracy claims have readily concluded that the existence and scope of the anticompetitive conduct and its impact on purchasers predominate over any individual issues.  This Court, in another pharmaceutical antitrust class action, observed that "[a]ntitrust actions involving common question of liability for monopolization and price-fixing have frequently been held to predominate for the preliminary stage of class certification." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. at 30.  In that case, the plaintiffs alleged that defendants unlawfully monopolized, conspired to monopolize, and fixed prices in the market for generic anti-anxiety drugs.  *Id.* at 12.  Chief Judge Hogan certified a class of purchasers, finding that the following common

questions were presented: (1) the definition of the relevant markets; (2) whether defendants had monopoly power in those markets; (3) whether that market power was willfully maintained by exclusionary means; (4) whether defendants conspired to monopolize and fix prices; (5) the success and impact of the defendants' monopolization, conspiracy to monopolize, and conspiracy to fix prices; and (6) the legality of the defendants' actions. *Id.* at 26-27; *see also Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279, 286-87 (D.N.J. 1997) (certifying monopoly claims under both federal and state antitrust law and finding that common questions were presented); *Davis v. Southern Bell,* 1993 WL 593999, at *8 (S.D. Fla. 1993) (granting class certification in monopolization case and noting that "[t]he complexity of these [individual] issues pales in comparison with the complexity of the issues related to proof of antitrust violation"). *See also* 4 Newberg § 18.26, at 18-83 to 18-86 ("[i]n antitrust suits, the issue of conspiracy, monopolization, and conspiracy to monopolize have been viewed as central issues which satisfy the predominance requirement").

In this case, there are multiple issues that can be proved with classwide evidence. Thus, the questions of law or fact common to the members of the Class predominate over questions affecting only individual Class Members' complaints, and the Class should be certified.

### 2.    A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Controversy

A class action is a superior device for adjudicating the effects of Defendants' allegedly unlawful actions on Third Party Payors' purchases of Ovcon 35. Neither the Parties nor the judicial system would benefit from duplicative litigation in this matter. Prosecution of this action as a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Fifth Moorings Condo., Inc. v. Shere*, 81 F.R.D. 712, 719 (S.D. Fla.

1979) (quoting 1966 Advisory Committee Notes to Rule 23, 39 F.R.D. 69, 102-03 (1966)); *accord United Nat'l Records, Inc. v. MCA, Inc.*, 101 F.R.D. 323, 329 (N.D. Ill. 1984). "What would be unmanageable is the institution of numerous individual lawsuits." *Scholes*, 143 F.R.D. at 189. Moreover, "[t]he cost associated with individual claims may require claimants with potentially small amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical. This in turn would result in unjustly enriching the Defendants; precisely the result antitrust laws are designed to remedy." *In Re Potash Antitrust Litig.*, 159 F.R.D. 682, 699 (D. Minn. 1995).

Thus, the alternative to a class action here is a multiplicity of scattered suits, resulting in the inefficient, and possibly inconsistent, administration of justice.

* * *

This Settlement satisfies all the requirements of Rule 23. Numerosity, commonality, typicality, and adequacy are all present in this case, with common questions predominating, and class treatment is the optimum way to handle this matter. Therefore, the Court should certify the proposed Settlement Class.

## V.    THE COURT SHOULD AWARD CLASS COUNSEL REASONABLE ATTORNEYS' FEES AND COSTS, AND AWARD THE CLASS REPRESENTATIVES INCENTIVE AWARDS

### A.    Reasonable Attorneys' Fees and Costs

"[A] trial court enjoys substantial discretion in making reasonable fee determinations." *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) (citing *Hensley v. Eckerhart*, 103 S. Ct. 1933, 1941 (1983)). As part of the Settlement, Defendants have deposited $1,100,000

into an escrow account called the Fees Fund.  Class Counsel now requests that the Court award them

the $1,100,000 in the Fees Fund as reasonable fees and costs in prosecuting this Action.

Because this case involves both a common fund and fee-shifting statutes, Plaintiffs believe

the Court can use its discretion to evaluate Class Counsel's request for fees either under a

percentage-of-recovery method or under the lodestar approach.  *See In re: Vitamins Antitrust Litig.*,

2001 WL 34312839, at *4 (D.D.C. July 16, 2001) (noting that some settlements do not fit neatly into

either the statutory fee shifting or common fund paradigm).  In the end, "[t]he Court's responsibility

is to use the approach most helpful in determining a fair and just award under the particular facts and

circumstances of the case before it." *Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 307 (D.D.C.

1996).  As shown below, under either approach, Class Counsel's request is reasonable given the

circumstances of this case.

### 1.    Lodestar Approach

Since the filing of this Action, Class Counsel has engaged in an extensive investigation

relating to the claims and underlying events alleged in the Complaint.  Among other things, Class

Counsel has: (1) reviewed and analyzed 800,000 documents produced by Defendants and third

parties; (2) engaged in legal research and analysis of a number of issues relating to class certification,

liability, causation and damages; (3) briefed substantive motions on liability and class certification;

and (4) retained and consulted with economists and other experts with respect to causation and

damages sustained by the Class as a result of the wrongful conduct alleged in the Complaint.

As set forth in separate declarations attached as Exhibits "D" through "I" to the Motion for

Final Approval, Class Counsel has spent a total of 4,575.40 hours prosecuting this Action.  Class

Counsel's lodestar therefore totals $1,550,110. Love Aff. at ¶ 23. In addition to the time expended, Class Counsel also incurred expenses of $225,350.43. Love Aff. at ¶¶ 24. Thus, Class Counsel seeks $1,100,000 from the Fees Fund to reimburse them for over $1,700,000 in total lodestar and incurred costs. Plaintiffs submit that under the lodestar approach, Class Counsel's request to recover less than 60 percent of its time and costs is reasonable. *See, e.g., In re: Children's Ibuprofen Oral Suspension Antitrust Litig.*, Case No. 04-535 (D.D.C. 2006) (awarding a fee that amounted to 68% of class counsel's time and expenses).

### 2.     Common Fund Approach

The Settlement could also be viewed as creating a $4,200,000 common fund (consisting of the $3 million product donation and the $1,200,000 in the Fees and Costs Funds). In common fund cases, courts in this circuit generally award a percentage of the fund after reviewing the following factors: (1) the size of the fund created and the number of persons benefitted; (2) the presences or absence of substantial objections; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case; and (7) awards in similar cases. *In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 383 (D.D.C. 2002). Class Counsel's request of $1,100,000 is 26% of the $4,200,000 common fund. "[W]hile fee awards in common fund cases range from fifteen to forty-five percent, the normal range of fee recovery in antitrust suits is twenty to thirty percent of the common fund." *Lorazepam*, 205 F.R.D. at 400. Thus, Class Counsel's fee request falls within the acceptable range for fee requests.

**(i)      Size of the Fund Created and the Number of Persons Benefitted**

Under the constructive fund approach, *see In re: Vitamins Antitrust Litig.*, 2001 WL 34312839, at *4 (D.D.C. July 16, 2001), courts add together the separate funds for class recovery and attorneys' fees into one total fund.  In this case, the various funds total $4,200,000.  Given the circumstances of this case, as discussed above in Section II, a $4,200,000 fund is quite an accomplishment.  Furthermore, thousands of the Class Members' insureds will benefit from the $3,000,000 product donation component of the $4,200,000 fund, and many of the Class Members themselves will indirectly benefit by not having to reimburse their insureds for these prescriptions.

**(ii)      Number of Objections to Fees**

The one objector to the Settlement did not address Class Counsel's request for attorneys' fees.  Love Aff. at ¶ 19.[7]   The fact of no objections is all the more remarkable considering that the Class is made up of thousands of sophisticated healthcare companies.  *See Freeport Partners,* 2006 WL 627140, at *10 ("The fact that there is no substantive opposition, despite an unusually well-informed class, also support the instant Attorneys' Fee Motion").

**(iii)      Skill and Efficiency of Counsel**

This case might have continued on for years if not for the Settlement.  Given the many hurdles in establishing liability, and the fact that Defendants were arguing that a majority of Class Members suffered little to no damages, the ability to settle for $4,200,000 while facing some of the best defense lawyers in the country speaks to the experience and skill of Class Counsel.

---

[7] The sole objection received to the Settlement might be interpreted as a *general* objection to Class Counsel receiving *any* reimbursement for fees and costs.

### (iv)    Complexity and Duration of the Litigation

As discussed above, this case was quite complex, involving issues related to FDA regulatory law, antitrust law, nationwide class certifications, indirect end-payor standing, and proximate causation and damages.  It took close to two years to sort out the facts and law of this case before a fair and adequate settlement could be reached.

### (v)    The Risk of Non-Payment

In this case, the risk of non-payment was very high.  Not only were Plaintiffs litigating against large pharmaceutical companies, but, as mentioned above, the Class faced substantial roadblocks before it could prevail.

### (vi)    Amount of Time Devoted by Counsel (Lodestar)

As shown above, Class Counsel's lodestar is over $1,500,000.  Class Counsel has also incurred over $250,000 in expenses. After subtracting the $250,000 in costs from the Fees Fund, $850,000 is left for fees.   If awarded the $1,100,000, counsel would be receiving about 55 % of their lodestar – less than a one multiplier.  In similar class action cases, "multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied." *Lorazepam,* 2003 WL 22037741, at *9.

### (vii)    Fee Awards in Similar Cases

Fees awards in class actions generally range from fifteen to forty-five percent, while antitrust class action cases fall in the twenty to thirty percent range.  *Id.* at  7.  Class Counsel's request for 26% therefore falls in the normal range for antitrust class actions.

* * *

In sum, we believe a review of the factors weighs in favor of granting Class Counsel's request for reasonable fees and costs incurred in prosecuting this Action.

### B.    The Court Should Grant Incentive Awards to the Class Representatives

Class Counsel also requests that the Court award each Plaintiff a $12,500 incentive award out of the Costs Fund to compensate them for their crucial assistance in prosecuting this litigation. In the Notice, we informed all Class Members that we would be seeking up to $25,000 of the Costs Fund for the Plaintiffs.  There were no objections.

Out of the thousands of Third Party Payors around the country, only Vista and United Food were willing to take on Defendants in a distant forum.  Both Plaintiffs assisted Class Counsel in various essential tasks, including document production, depositions, participating in discussions on damages with the expert, and taking part in the settlement negotiations.  Finally, it was quite evident that both Plaintiffs took their fiduciary duties very seriously when, after weighing the pros and cons on the Action as understood after a year of discovery, they ultimately decided that it would be in the best interest of the Class to settle this Action for the $3 million product donation, thus depriving themselves of any opportunity to recover potential damages.

"[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *See In re Lorazepam & Clorazepate Antitrust Litigation*, 205 F.R.D. 369, 400 (D.D.C. 2002) (quoting *Cullen v. Whitman Med. Corp*., 197 F.R.D. 136, 145 (E.D. Pa. 2000)) (awarding $25,000 for three class representatives and $10,000 for three other class representatives); *In re: Carbon Black Antitrust Litig.,* Case No. 03-10191 (D. Mass. 2007) (awarding $15,000 to each class representative); *Vista*

*Healthplan v. Bristol-Myers Squibb Co.*, 01-01295 (D.D.C. 2003) (awarding $40,000 and $10,000 to each class representative).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs and Class Counsel respectfully request that the Court grant Plaintiffs' Motion for Final Approval, grant Class Counsels' Request for Attorneys' Fees, Costs and Incentive Awards, and enter the proposed Order and Final Judgment, attached to the Motion for Final Approval as Exhibit "A."


Dated: October 23, 2007                         Respectfully submitted,


                                                s/ Kevin B. Love
                                                Kevin B. Love (specially admitted)
                                                Joshua A. Migdal
                                                HANZMAN CRIDEN & LOVE, P.A.
                                                7301 S.W. 57th Court, Suite 515
                                                South Miami, Florida 33143
                                                Telephone: (305) 357-9000
                                                Facsimile: (305) 357-9050

                                                L. Kendall Satterfield (Bar # 393953)
                                                Michael G. McLellan (Bar # 489217)
                                                FINKELSTEIN, THOMPSON & LOUGHRAN
                                                1050 30th Street, N.W.
                                                Washington, D.C.  20007
                                                Phone: (202) 337-8000
                                                Facsimile (202) 337-8090

                                                Jay Shapiro
                                                STEARNS WEAVER MILLER WEISSLER
                                                ALHADEFF & SITTERSON, P.A.
                                                150 W. Flagler Street, Suite 2200
                                                Miami, Florida 33130
                                                Phone: (305) 789-3200
                                                Facsimile (305) 789-3229

Marc A. Wites
**WITES & KAPETAN, P.A.**
4400 North Federal Highway
Lighthouse Point, FL 33064
Phone: (954) 570-8989
Facsimile (954) 428-3929

Joseph C. Kohn
William E. Hoese
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Phone: (215) 238-1700
Facsimile: (215) 238-1968

Eric L. Young
**KENNEY LENNON & EGAN**
3031C Walton Road, Suite 202
Plymouth Meeting, PA 19462
Phone: (610) 940-9099
Facsimile: (610)-940-0284

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing were served via e-mail on this

23th day of October 2007, on the following persons:

| | |
|---|---|
| Peter C. Thomas, Esq. | Karen N. Walker, Esq. |
| Simpson Thacher & Bartlett LLP | Mark L. Kovner, Esq. |
| North Building | Kirkland & Ellis LLP |
| 601 Pennsylvania Avenue, N.W., | 655 Fifteenth Street, N.W. |
| Washington D.C. 20004 | Washington D.C. 20005 |
| Telephone: (202) 220-7700 | Telephone: (202) 879-5000 |
| Facsimile: (202) 220-7702 | Facsimile: (202) 879-5200 |

***Counsel for Warner Chilcott***               ***Counsel for Barr Pharmaceuticals***


s/ Kevin B. Love

Kevin B. Love


L:\103\Final Approval\Vista's Memo For Final Approval Rev.wpd

-33-